JOHN W. ARGABRIGHT V. STATE OF NEBRASKA.

FILED JULY 10, 1901. No. 11,340.

1. **Action on Application for Change of Venue Discretionary.** An application for a change of venue in a criminal prosecution is addressed to the sound discretion of the trial court and its ruling thereon will not be disturbed when no abuse of discretion is disclosed. *Welsh v. State*, 60 Nebr., 101.

2. **Overruling Application Not Error Where It Is Not Shown that Defendant Can Not Have Fair Trial in Original Venue.** It is not error to overrule an application for a change of venue in a criminal trial when from all the evidence introduced in support and in resistance of the application, there is not shown to exist any reasonable ground for the belief that the defendant can not have a fair and impartial trial in the county from which a change of venue is applied for.

3. **Law of the Case.** Where, in a criminal prosecution, instructions given the jury are assigned as error and on appeal such instructions held properly given, and on a subsequent trial the same instructions are given and again assigned as error, the decision of the question on the first appeal will be held to be the law of the case and followed in reviewing the case on the appeal last taken.

4. **Not Error to Refuse Cumulative Instructions.** It is not error to refuse to give an instruction stating a proposition of law which is substantially covered and included in an instruction already given.

5. **Misconduct of Counsel.** Misconduct of counsel for the state in the argument of the case, in order to work prejudicial error, must have been in disregard of the rules of legitimate argument of the evidence, and sufficient to unduly influence the jury and prejudice the rights of the defendant.

6. **Where Counsel Argues Dehors the Record, Misconduct May Be Cured by Court's Instructions.** Where counsel for the state referred in an argument to the jury to facts not in evidence, and upon objection that the statements were unwarranted by the evidence the district court instructed the jury to disregard such statements, there was left no ground for complaint, for the reason that the court, when appealed to, granted all relief prayed for. *Hoover v. State*, 48 Nebr., 184.

7. **Alleged Misconduct Insufficient.** Alleged misconduct of assistant counsel for the state examined, and *held* insufficient to have improperly influenced the jury or prejudiced the rights of the defendant.

8. **Question Not Prejudicial When Objection Is Sustained.** Record examined, and *held* no prejudicial error was committed by counsel for state asking questions of witness claimed to have been pregnant with assumptions and insinuations, the objections interposed to such questions having been sustained by the trial court.

9. **Refusal to Call Impeached Witness Not Suppression of Evidence.** The refusal of the state to call certain witnesses, on a second trial, whose testimony on a former trial had been impeached, there being many other trustworthy witnesses by which the same facts could be proven, *held* not a suppression of evidence nor prejudicial to the rights of the defendant.

10. **Law of the Case.** The defendant on a former trial was found guilty of murder in the first degree, and on error to this court the evidence was examined and found sufficient to support the verdict. A subsequent trial resulted in a like verdict, and on error it is again urged that the evidence is insufficient to support the verdict. The evidence in the last trial being substan-

tially the same and fully as strong and convincing on the part of the state as in the former, *held* that the decision first had on the sufficiency of the evidence has properly become the law of the case decisive of the question and to be followed in the subsequent review of the case.

11. **As an Original Question, the Verdict Sustains the Evidence.** *Held further*, as an original and undecided question from an examination of the record, that the evidence is sufficient to support the verdict of guilty of murder in the first degree as found by the jury.

12. **Verdict Not Result of Passion and Prejudice.** *Held,* also, from an examination of the record, that the verdict is not the result of passion and prejudice on the part of the jury.

ERROR from the district court for Nemaha county. Tried below before LETTON, J.  *Affirmed.*

*William H. Kelligar* and *Francis Martin,* for plaintiff in error:

The defendant was prosecuted in the district court of Nemaha county under an indictment for murder in the first degree, for the killing of one William Smelser on the night of February 9, 1894.  At the time of the tragedy the defendant was a resident of South Omaha, where he had resided about three years, and at the date named was one of the police force of that city.  The defendant's wife, Rose Smelser Argabright, was the daughter of the deceased.  By this union there were two children, one about two and one-half years old at the time of the tragedy, and the other an infant.  Until within about four months of the date of the tragedy, the defendant's family resided with him at South Omaha; but at said date were living at the home of the deceased.  It appears of record that there had been some trouble between the defendant and his wife.  The cause is not disclosed and is immaterial.  The difficulty ending in the tragedy, occurred in an ordinary country schoolhouse.  The building was thirty-six feet long by twenty-four feet wide, and was supplied with thirty-three desks, a stove, and a platform eight feet wide and twenty feet long.  At the time of the shooting there were some

forty to sixty people in the schoolhouse, congregated in the rear part. On the 8th day of February, 1894, the defendant left South Omaha, came by rail to Howe, Nemaha county, and from thence went to his father's place for the purpose of seeing his children, who were then at Mr. Smelser's home in the same neighborhood. He had made a prior visit to the same place, for the same purpose, on November 28, 1893. At the former visit, with considerable difficulty, he had seen his baby only. He had not seen his little boy since he was first taken from him, more than three months before. The first time he came to the county to visit his children, he met the defendant, on the road from Howe, and requested to see them. The request was denied, with a command to keep off the premises of deceased. On the occasion of the second visit he again met the deceased, who refused to speak to him. Both the defendant and his father failed in an attempt to arrange a meeting between the father and his children at the home of Mrs. Copeland, a daughter of the deceased, who resided across the road from her father. The deceased refused to permit the meeting. On the night of February 9th, an entertainment was given at the Champion schoolhouse. The defendant attended it. After it was over he saw Mrs. Smelser with his sleeping boy in her arms; and as she started to leave the room he stepped forward, and requested her to let him see the boy. When he did this the deceased assaulted him; and a fight took place, which culminated in the death of William Smelser. The defendant claims that he acted in self-defense.

The defendant was entitled to a change of venue. 4 Ency. Pl. & Pr., 398; *Muscoe v. Commonwealth,* 87 Va., 460, 462.

The minds of the jury were not purged of the gangrene of the statements and reprehensible arguments by the court's instructions. *People v. Ah Len,* 92 Cal., 283, 284; *Martin v. State,* 63 Miss., 505; *State v. Towler,* 13 R. I., 661, 666.

There is no evidence that the killing was premeditated.

The purchase of the Colt's revolver was necessary to the performance of his duties as night policeman. The mackintosh was a necessity in cold weather. No statement made by the defendant prior to the shooting has been shown to have referred to any contemplated killing of the deceased.

*Constantine J. Smyth, Attorney General,* and *Willis D. Oldham, Deputy,* for the state.

HOLCOMB, J.

The plaintiff in error was the defendant in a criminal prosecution had in the district court of Nemaha county, in which he was charged with murder in the first degree for the killing of one William Smelser in said county on the night of February 9, 1894. The prosecution resulted in a conviction of guilty of murder in the first degree, the jury fixing the punishment at imprisonment in the state penitentiary for life. Prior to the trial we are now asked to review, the defendant has been twice before tried, the first trial resulting in a verdict of manslaughter and the second of murder in the first degree. By proceeding in error to obtain a review and reversal of the judgments rendered on the verdicts thus returned the defendant has in each instance been successful, and the judgments so rendered were reversed by this court and new trials awarded. The opinions resulting in such reversals and the reasons therefor are found in *Argabright v. State,* 49 Nebr., 760, and under the same title on the second appeal in 56 Nebr., 363. After the case was reversed and remanded the second time the defendant applied to the trial court for a change of venue on the grounds that a fair and impartial trial could not be had, and a fair, impartial and unprejudiced jury could not be obtained, in said county. The specific grounds for the application were, in substance, that by reason of the defendant's conviction in the two former trials great notoriety and wide publicity had been given the transaction surrounding the homicide, and that a general

sentiment was prevalent that the defendant was guilty as charged, which would prevent a calm and dispassionate inquiry into the merits of the case. It is also claimed that a strong prejudice existed against the defendant because of the cost of the prosecution of the defendant, which permeated the whole county and tended to influence the action of a jury, to the defendant's prejudice. The application for a change of venue was resisted by the state, and upon a hearing, in which there were filed numerous affidavits in support of the application and in resistance thereof, the trial court overruled the motion, to which the defendant excepted, and now assigns error on the ruling. The defendant filed his own affidavit in support of his motion, in which, with some particularity as to causes set forth in the motion, and also of alleged false reports of his conduct while imprisoned, placing him in the light of being unruly and recalcitrant, he sought to sustain the contention that there existed a deep-seated prejudice against him, extending to all parts of the county, which would prevent a fair and impartial hearing of the charge pending against him. Some eight or ten other affidavits of a general nature sustaining the grounds stated in the application were also filed. In opposition there were presented some sixty affidavits of citizens from all parts of the county, the substance of which was that no undue excitement or interest had been created by reason of the former trials; that no prejudice existed against the defendant and no feeling manifested because of the expense entailed on the county arising from the prosecution of the defendant. In many of the affidavits it was stated that in many of the localities but little was known of the supposed facts surrounding the homicide, and no unusual interest manifested at any time. In all the affidavits it was stated that a fair and impartial jury could be secured to try the case; other affidavits denying specifically some of the statements in support of the motion were also introduced. The record does not show any abuse of discretion in the ruling complained of. From all the evidence presented in support of the mo-

tion it seems reasonably clear that there existed no reasonable grounds for the belief that the defendant could not have a trial by a jury free from prejudice and fair and impartial in all respects. The showing we regard as insufficient to establish error in the court's ruling denying the motion. In *Welsh v. State*, 60 Nebr., 101, it is held that "An application for change of venue or a continuance is addressed to the sound discretion of the court, and its ruling thereon will not be disturbed where no abuse of discretion is disclosed." Applying the rule to the case at bar the defendant's contention must be held not held well founded.

Instructions 4 and 5, given the jury, are excepted to and the giving thereof assigned as error. These instructions are almost identical with instructions numbers 4 and 13 given on the second trial and held on review of the case to have been properly given. *Argabright v. State*, 56 Nebr., 363, 366. The decision there made has become the law of the case and will be adhered to on this, a subsequent appeal involving the identical question there passed upon. While there was a slight modification in one of the instructions as compared with the one first given and approved by this court, the change was altogether favorable to the defendant and conformed more nearly to his contention as to the evidence bearing upon his actions immediately preceding the tragedy.

Complaint is made because the trial court refused to give an instruction requested by defendant on the law of self-defense. The requested instruction is as follows:

"No. 1. If the jury believe from the evidence, that at the time the said defendant is alleged to have shot the deceased the circumstances surrounding the defendant were such as in sound reason would justify, or induce in his mind, an honest belief that he was in danger of receiving, from the deceased some great bodily harm, and that the defendant, in doing what he then did, was acting from the instinct of self-preservation, then he is not guilty, although there may have been no real or actual danger."

On its own motion the court gave instruction number 20 on the same subject.

"No. 20. Upon the question of self-defense the court instructs you when a person is assaulted by another in such a manner as to incite in him a reasonable belief that he is in danger of losing his life, or receiving great bodily injury, he may legally resist the attack by employing such reasonable means within his power as are apparently necessary to defend himself. In order to justify self-defense, it is not indispensable. that there should exist actual and positive danger. A party who is assaulted in such a way as to infuse in him a well grounded and reasonable belief that he is in danger of suffering great bodily harm will be justified in defending himself, although the danger be not real, but only apparent. In other words he is justified in acting upon the facts as they appear to him at that time and is not to be judged by the facts as they actually are. And in this case, if the jury believe from the evidence that the defendant was assaulted by the deceased in such a way, and under such circumstances as to infuse and fix in his mind a sincere conviction that his life was in danger, or his body in eminent peril, then he was justified in defending himself, whether the danger was real or only apparent. The law considers that men when threatened with danger, are obliged to judge from appearances and . determine therefrom as to the actual state of things surrounding them; and in such cases if persons act from honest conviction induced by reasonable evidence they will not be held responsible criminally for a mistake as to the extent of the actual danger."

We regard the subject as having been fully covered in the court's own instruction as favorably to the defendant as the one requested, and for that reason it was entirely proper to refuse to give a second instruction covering the same point. It is said the instruction is faulty because by some of the testimony there is evidence tending to show that a son-in-law of the deceased also and at the same time made an assault on the defendant. We do not so regard

it. All the evidence was before the jury and it was for them to say whether, under all the facts and circumstances disclosed by the evidence, the defendant was justified in shooting the deceased in order to repel the threatened assault. The assault made by the deceased's son-in-law, if found by the jury, was one of the circumstances to be considered in determining the situation of the defendant, and whether there existed at the time reasonable grounds for a well-founded belief that he was in real or apparent danger of death or great bodily harm and killed the deceased under an honest conviction that the act was necessary for self-preservation. There was no error in refusing to give the requested instruction.

Much of the brief of counsel for defendant is devoted to a discussion of alleged misconduct of counsel assisting in the prosecution of the case, which, it is urged, was prejudicial to the defendant's rights, and on account thereof the judgment should be reversed. From the record we infer that a great deal of warmth of feeling was engendered between assistant counsel for the state and defendant's counsel. Much of the criticism grows out of the arguments made to the jury after the introduction of the evidence. Assistant counsel for the state made the closing argument, and it is claimed he departed, in several instances, from a legitimate discussion of the evidence in the case. Some of the objections are based on statements made in reply to the line of argument adopted by counsel for the defendant and do not seem to merit the criticism offered. In several instances we regard the statements of counsel for the state as reprehensible, and an apparent attempt to discuss matters not warranted by the evidence. The defendant's counsel, however, on all such occasions, was prompt to interpose an objection, and the court, when the objection was well taken, with equal promptness sustained the objection, instructed the jury to disregard the statement and all statements of counsel not founded on the evidence and admonished counsel to keep within the sphere of legitimate argument. The court would have been justified in more severely

rebuking the counsel than was done. The defendant's substantial rights were not, we think, invaded or prejudiced by the conduct complained of. Usually the matters referred to were not pertinent to the issues in the case. They were petty references to matters outside of the record which, as we view the subject, neither assisted nor in anywise obstructed the jury in arriving at a fair and impartial verdict. Frequently objections to the argument of counsel were interposed, which, upon consideration, the court properly overruled on the ground that the argument was legitimate and warranted by the evidence. In no instance was an objectionable argument engaged in to the extent of stating with fullness the subject referred to. No very accurate or intelligent idea could be formed as to counsel's meaning or the impressions he sought to convey by the objectionable remarks. Counsel for defendant, vigilant in protecting the rights of his client, would instantly object at the beginning of the statement, and upon the objection being sustained, the argument would again be resumed on lines unobjectionable. The record does not disclose a persistent effort to override the court and continue arguing any particular matter objected to, or wantonly overstep the bounds of propriety, but rather, in many instances during the closing argument, probably through inadvertence, a want of a clear conception of the line of legitimate argument, and an under-estimation by counsel of his duty to, with circumspection, maintain the dignity of the state and assist to enforce its laws only by methods and arguments entirely unquestionable in character, the bounds of legitimate argument would be trespassed upon, when an objection would be interposed, sustained, if proper, and acquiesced in by counsel, and the argument would be brought within its proper sphere. The court having in the main sustained the objections interposed by counsel for defendant, instructed the jury properly regarding the matter and admonished assistant counsel for the state to refrain from the objectionable line of argument, secured the protection of defendant's rights to which he was entitled and he has

now no substantial ground of complaint on that account. *Hoover v. State,* 48 Nebr., 184. An investigation of the record satisfies us that the jury were not influenced by the misconduct complained of, nor were the rights of the defendant prejudiced thereby, and that no sufficient reason appears for disturbing the verdict on that ground.

In this connection, it is also contended that there was misconduct of counsel for the state amounting to prejudicial error in asking witnesses leading and improper questions pregnant with assumptions and insinuations detrimental to the rights of the defendant and in violation of the rules of legal evidence. No complaint is made on the admission of improper evidence. It is conceded that the rulings of the court on the alleged improper questions were without error, but it is insisted that the questions propounded are, obviously, objectionable and for the purpose of unduly influencing the jury, counsel knowing full well that an answer would not be permitted. We are unwilling to believe counsel's motives were as contended for, or that prejudice to the defendant was occasioned by such questions. Many of the questions, it is true, were improper, and the trial court properly excluded the witnesses' answers thereto. But this occurs in all trials. It is one of the most common incidents to every trial of importance to have many questions propounded by counsel on both sides of the controversy which are by the trial court held improper. There is in this case, as we gather the proceedings from the record, no such willful misconduct of counsel in propounding questions to the different witnesses, or wanton disregard of the rules governing the examination of witnesses and the introduction of evidence, as to amount to prejudicial error, and the assignment of error in respect thereof can not be sustained.

Error is sought to be predicated because the court permitted the attorneys for the state to suppress alleged evidence within their knowledge and under their control which was used on the former trials of the case and which the defendant could not use except by way of cross-exam-

ination, and which suppressed evidence, it is claimed, would reduce the finding of the jury as to the degree or grade of the crime committed or result in an acquittal. This assignment of error is based on the following circumstances, which transpired subsequently to the homicide, but in relation thereto: Three witnesses called by the state on the former trials to give evidence regarding the facts surrounding the homicide to which they were eye witnesses, after testifying, were, by the defense, apparently successfully impeached by proving by the coroner, and perhaps otherwise, that at the coroner's inquest the witnesses had given testimony radically opposed and quite contradictory to their testimony given on the trial of the case. It was proven or admitted that these witnesses gave testimony at the time of the coroner's inquest more favorably to the defendant, and the tendency of which was to prove that the defendant had been, not only by the deceased, but also by his son-in-law, vigorously assaulted until he was crowded down and apparently overpowered and hard pressed at the time the fatal shot was fired. The statements made by these witnesses before the coroner's jury at the inquest gave substantial support to the theory of the defense that the killing was done in self-defense. On the former trial the same witnesses called by the state testified regarding the circumstances of the homicide substantially in harmony with the other witnesses examined by the state regarding the same matter, and which tended to show that the act of shooting was not justified on the ground of self-defense, and that the defendant was in no immediate, real or apparent danger when he fired the fatal shot. The witnesses being thus impeached, the state declined to use them further. There were many who witnessed the tragedy and whose testimony was not of the unreliable character of those who were not called and of which complaint is made. The evidence of these witnesses was certainly unworthy of much credence. They were sadly mistaken in their first version of the affair or the one later testified to. Having been thus proven unreliable,

we know of no rule of law that would compel the state to call them as witnesses in order that their evidence might be impeached. Declining to call them was not a suppression of evidence, but a refusal to ask a conviction of the defendant on confessedly unreliable, if not false, testimony. The homicide having been committed in a crowded schoolhouse and witnessed by a large number of persons, there existed no reasonable necessity for resorting to the testimony of witnesses so unworthy of belief. The state could not be required to place these witnesses on the stand and interrogate them for the purpose of allowing the defendant to show that they made statements regarding the transaction favorable to his theory of the case. The true inquiry was not whether certain witnesses had made contradictory statements regarding a material fact, but what were the true facts regarding the matters in issue, and this was to be ascertained by the best and most reliable evidence obtainable. The defense, as well as the state, had recourse to the testimony of a number of witnesses to the transaction who were just as competent and much more reliable and worthy of belief than those not called on the last trial. The trial court did not err in refusing to require the state to produce the three witnesses mentioned and have them testify.

It is earnestly argued that the verdict is not supported by sufficient evidence; that there is a total want of evidence to prove premeditation; that malice is not shown, except as it may be inferred from the act of shooting; and that the verdict is the result of passion and prejudice caused by the improper conduct of the prosecution and the refusal of the court to grant a change of venue. While there is some merit in the argument we are disposed to the view, after a consideration of the entire record, that the contention of counsel in this regard ought not to prevail. The question can hardly be considered an open one. On the former hearing the same question was presented and decided adversely to the defendant. *Argabright v. State,* 56 Nebr., 363. It is there stated in the first paragraph of

the syllabus: "Evidence examined, and held sufficient to sustain a verdict of murder in the first degree." Says NORVAL, J., writing the opinion: "The killing is admitted, but it is asserted that there is no evidence to establish premeditation, deliberation, and malice. A careful perusal of the bill of exceptions convinces us that this contention is without foundation. It was established that defendant, a short time before the tragedy, purchased the revolver with which the fatal shot was fired, also bought a long-caped mackintosh, under which the revolver was concealed the night of the tragedy; that before leaving South Omaha he was advised by a friend not to take the fire-arm with him on his trip to Nemaha county, else he might get into trouble; that the defendant related his family difficulties to W. H. Beckett, and in that conversation with reference to his children and his father-in-law stated to Beckett 'that he would have his children or kill the old son-of-a-bitch'; that just before the defendant entered the train at South Omaha on February 7 he showed his revolver to James Emerick and stated to the latter as he stepped on the cars: 'I shall surprise you wonderfully when I come back'; and that while the defendant was at the home of Mrs. Copeland the day preceding the tragedy he stated to her 'that he had offered everything that was fair, and they would not let him see the children, and that he proposed to make it hot for them'; and in the same conversation stated that he would see the children before a week. These facts detailed by disinterested and credible witnesses, considered in connection with the actions and conduct of the accused at the schoolhouse the night of the homicide as detailed by the state's witnesses, are ample to show that the life of the deceased was taken with deliberation and premeditation, and that the verdict is not the result of either passion or prejudice on the part of the jury." These observations of the present chief justice apply with equal force to the evidence in the record now before us. We may, with perfect fairness to the defendant, say that the evidence on the last trial is fully as strong and

convincing as on the former trial, and that there is no substantial difference between the evidence on the part of the state in the two trials. Our attention has been invited by the defendant to the bill of exceptions containing the evidence taken on the second trial, and we have the same now before us. If the evidence is not materially different on the last trial from that introduced on the second trial, then the holding as to the sufficiency of the evidence on the former hearing has become the law of the case, to be followed in all subsequent proceedings. Treating the objection, however, as an original and undecided question, an independent examination of the record of the proceedings of the last trial must, we think, lead to the same conclusion. To review the evidence in detail would require us to repeat much that is said by Chief Justice Norval in the opinion from which we have quoted, which it would serve no useful purpose to do. It is said that the witness Beckett's testimony as to the alleged threats of the defendant has been rendered worthless by the testimony of the former county attorney and four members of the grand jury presenting the indictment against the defendant, to the effect that the witness, when called before the grand jury, stated that he had never heard the defendant make any threats against the deceased, but that he knew of two or three men who did. Grant that such is the case, and yet there is aside from such testimony sufficient evidence to warrant the finding of the jury. Leaving out of consideration altogether Beckett's testimony, the purchase of the revolver shortly before the homicide, the purchase of a mackintosh overcoat for the purpose, according to the state's theory, of better concealing the weapon, the statement of defendant testified to by one witness, that something surprising would happen before he returned, the incontrovertible fact remains, and stands prominently towering above the surrounding circumstances, that the defendant, obtaining a leave of absence from his duties as a policeman in South Omaha, left for the vicinity where the deceased resided with the defendant's wife and children,

armed with a deadly weapon, without any rational excuse
or cause therefor, and in the face of the advice of the chief
of police under whom he served, not to take his revolver,
as it might be the means of getting him into trouble. The
advice was given the defendant not to take the weapon,
not only because he might get into trouble, but also be-
cause it was not thought advisable or proper for a police-
man when off duty to be carrying deadly weapons about
his person. It is true there is testimony tending to show
that the defendant offered to let another officer have his
revolver shortly before he left for the purpose of seeing,
as he claims, his children or obtain permission to visit
them. Unfortunately for him, however, he did not give up
the weapon but retained it and persisted in carrying it
with him on a mission in which there existed not the
slightest excuse for carrying such an article, the carrying
of which could only be regarded from any lawful point of
view as a burden and inconvenience. It is urged that the
defendant visited the neighborhood of the deceased, who
was his father-in-law, where lived defendant's wife and
children who was separated from him, for the purpose of
seeing his children, and that in the event of his failure to
obtain the voluntary consent of the parties interested, he
intended to apply to the courts for an order granting him
the desired permission. The evidence, however, shows that
after an attempt and failing in his object in making some
amicable arrangement, he took no further steps looking to
a resort to the courts save to make some mention about
being taken to a nearby station to telegraph his lawyer,
and that on the evening of the same day the unsuccessful
effort was made he went to an entertainment at the school-
house where the tragedy occurred, armed with his revol-
ver, which was concealed from view by his overcoat, where
he remained after the close of the exercises in about the
same position near the door for twenty or thirty minutes
and until the family of the deceased started for the door
to leave the building, when the shooting occurred. It is
in evidence that the defendant said to a brother-in-law

who was with him while standing near the door: "I will stand right here." He was apparently waiting for the approach of the family of the deceased. The mother-in-law was carrying in her arms one of defendant's little children. As she approached the defendant, he reached out his hands and inquired if the child was his. Some of the witnesses testify that the defendant reached forth his hands as if to take the child. The defendant's counsel contend that he made no attempt to take the child, but only inquired if it were his child and started to lift a veil or covering of some kind from its face. We think the evidence warrants the inference that he was about to take the child, and those in whose custody it was were justified in so believing. At the time he stretched forth his hand as if to take the child the deceased's wife, who was holding it, turned suddenly around to escape him and at the same time deceased struck over her shoulder at and, as testified by some, hit the defendant on the head. The act was evidently for the purpose of driving the defendant away and permitting egress from the building to his family. It was not a dangerous blow or one calculated to excite grave apprehensions as to the safety of the person struck. The deceased's hands were incased in mittens and remained so until after his death. The defendant immediately drew his revolver and stepping back only a short distance, while the deceased continued to strike, as most of the witnesses expressed it, sidewise as if to ward off or strike the revolver in the defendant's hand, and in a moment's time the fatal shot was fired. The defendant was not crowded to the wall, but was standing out therefrom in an aisle next to the one where he had been standing after the conclusion of the exercises and with the distance of one ordinary school seat between him and the deceased. He was standing erect or leaning a little towards the deceased and the deceased leaning a little towards him when the shot was fired. These are, substantially, the facts as we glean them from the record. The theory that the defendant was justified in the act on the ground of self-defense we regard as

utterly untenable.  He appears to have been in no serious danger whatever, real or apparent.  He drew his revolver almost the same instant the deceased struck at him in the manner heretofore stated and fired the shot but a moment or two thereafter.  He was apparently inviting a conflict and seized the first opportunity to attack the deceased in a deadly manner and cause his death.  If the truth were laid bare and the fact considered free from human imperfections, we do not believe the act could be regarded as other than malicious.  Some doubt may possibly arise in the minds of some as to the necessary elements of premeditation and deliberation in order to constitute murder in the highest degree, and of which the defendant was found guilty.  Murder in the second degree would have been more satisfactory to the writer were he permitted to express his individual views.  But however we may look at the question, as triers of fact it can not be said, after consideration of the record presented, that there is insufficient evidence to sustain the conclusion arrived at by the jury, whose duty and province it was to weigh the evidence and deduce the facts justified thereby.  The verdict is supported by sufficient evidence.

Somewhat related to the subject last discussed is an assignment of error to the effect that the verdict is the result of passion and prejudice.  In the motion for a new trial the ground furnishing a basis for this assignment of error was supported by several affidavits of divers persons of certain alleged statements made by different jurors as to the motives which actuated them in returning the verdict they did, which, if competent and true, would support the contention of counsel that the verdict was not the result of a fair and dispassionate consideration of the evidence, but of considerations which should not have entered into the deliberations of the jury.  These affidavits were denied individually by the jurors alleged to have made the statements, and a general affidavit by all the jurors was presented denying that any improper influences or considerations entered into their deliberations or affected the ver-

dict returned, and that the verdict was the result of a full and fair consideration of the evidence, and nothing else. As a question of fact solely the court was, we think, justified in finding in favor of the state. The record does not warrant the conclusion that the verdict of the jury was the result of passion or prejudice. The showing is entirely insufficient to overcome the presumption, which is fully borne out by the record, that the verdict was in response to a faithful discharge by the jury of the obligation they assumed to try the questions of fact submitted to them impartially from the evidence and the law as given by the court. As we have already determined, the evidence is sufficient to support the verdict, and we prefer to believe that it was from the evidence and not from other considerations wholly improper that the jury were constrained to the action taken.

We find no error in the record prejudicial to the defendant and must, therefore, overrule the different assignments of error and affirm the judgment of the trial court, which is accordingly done.

AFFIRMED.