**UNITED STATES of America, Appellee,**

v.

**Anthony G. FAMULARI and Charles Joseph Mattei, Appellants.**

Nos. 1049, 1056, Dockets 71–1143, 71–1248.

United States Court of Appeals, Second Circuit.

Argued July 16, 1971.

Decided Aug. 19, 1971.

Edward R. Korman, Asst. U. S. Atty. (Edward R. Neaher, U. S. Atty., and David G. Trager, Asst. U. S. Atty., E.D. N.Y., on the brief), for appellee.

Herbert A. Lyon, Kew Gardens, N.Y. (Spiros A. Tsimbinos, Kew Gardens, N. Y., on the brief), for appellant Anthony G. Famulari.

Robert Kasanof, Robert Hermann, New York City, and The Legal Aid Society, on the brief for appellant Charles Joseph Mattei.

Before FRIENDLY, Chief Judge, and LUMBARD and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

Appellants, Famulari and Mattei, appeal from judgments of conviction entered on February 9, 1971 in the Eastern District of New York after a jury trial before Judge Weinstein. Famulari was found guilty of bank robbery, assault by use of a dangerous weapon during the commission of a bank robbery, and conspiracy to rob a bank, in violation of 18 U.S.C. §§ 2113(a) and (d), 2, and 371. He was sentenced to a prison term of eight years on each of the first two offenses and five years on the third, with the sentences to run concurrently. Mattei was convicted of bank robbery and conspiracy to rob, in violation of 18 U.S.C. §§ 2113(a), 2, and 371, and was sentenced to concurrent prison terms of ten and five years respectively. We affirm the convictions.

On April 23, 1970, a national bank in Queens County was robbed of $44,960.72 by three men wearing navy-blue ski masks and dark overcoats and carrying pistols in their gloved hands. One of the men also carried a red, white, and blue shopping bag proclaiming the mayoral candidacy of Mario Procaccino, and he filled the bag with the money. Although the robbery lasted no more than three or four minutes, the discomfiture of the ski masks caused two of the men to begin removing them before they had left the bank. One of them, Anthony Molese, happened to be in perfect range of the bank's surveillance camera as he removed his mask, and an unusually clear photograph was obtained. While the cameras did not capture the other robber removing his mask, the Assistant Manager of the bank, Gregory Lamont, got a look at his profile for about ten or fifteen seconds as he departed the bank.

On May 2, 1970, Molese was arrested by the F.B.I., and the Procaccino campaign bag was recovered along with some $10,000 in cash. After being confronted with the photograph, Molese decided to confess and to cooperate in the apprehension of his accomplices. In return for his cooperation, the charges against him arising out of the instant bank robbery and another bank robbery were dropped when he pleaded guilty to a third bank robbery and was sentenced to seven and one-half years imprisonment. Molese told the F.B.I.—and later testified at trial—that his accomplices in the instant robbery were Anthony Famulari, who carried the bag, and Peter Siciaranno, and that Charles Mattei had driven them to the bank in his girl friend's car. Molese stated that after the robbery, the trio went to Siciaranno's apartment and divided the money among themselves and Mattei; each of the actual participants got about $12,600 and Mattei received $6,100 for his efforts.

Several weeks after the robbery, the police showed Assistant Manager Lamont twenty to thirty photographs. Out of that array, Lamont picked a photograph of Famulari and stated that it was similar to the robber whom he saw removing the mask in all respects save that the robber had long pointed sideburns which were not indicated in the photograph. Because of that discrepancy, Lamont could not make a positive identification. At this time, Lamont was not aware that Famulari had been inculpated by an accomplice. While tes-

tifying before the grand jury, Lamont again stated that Famulari's photograph looked similar to the robber, but he could not make a definite identification.

Prior to his scheduled appearance as a witness at the trial, Lamont was shown the photograph of Famulari which he had picked out. He again stated that he could not be certain, although the photograph was similar; he told the Assistant United States Attorney that "If I saw him, if I could identify him, I would say so." Then, on his way into the courtroom to testify, Lamont looked through the window of the courtroom door and saw Famulari at the defense table. He said that Famulari's profile at that moment was identical to the profile of the robber at the bank, and that he would never forget that face.

At the conclusion of a subsequent *voir dire,* Judge Weinstein ruled, over defendants' objection, that an in-court identification by Lamont would be allowed since it did not appear that the viewing through the courtroom door had been arranged by the government, but was merely a happenstance.[1] Lamont then made a positive identification at trial that Famulari was one of the robbers. Two days later, after the cross-examination of Lamont was concluded, Judge Weinstein advised counsel as follows:

"Now, with respect to this identification, I have been giving it a good deal of thought overnight. I think the record as it now stands is susceptible of a finding that the witness

Lamont's seeing the defendant through the door was not a mere happenstance which can't be avoided in some trial —we can't control everything—but that it was deliberately designed to find out whether he could identify the defendant.

"That being so, I think under [United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1966)] it would constitute an impermissible show up, because the conditions were clearly such that it would induce a person to find, even if he had a doubt. That would lead me to exclude the in-court identification should I make that finding. I don't say I make it yet."

In fact, Judge Weinstein never made a finding that the identification through the courtroom door was deliberately staged. Although he did subsequently instruct the jury to disregard the in-court identification,[2] he stated in chambers that he was doubtful that exclusion of that identification was required under *Wade,* but that he was excluding it "out of caution."[3]

In addition to his in-court identification of Famulari, Lamont also testified at trial as to his selection of Famulari's photograph out of the group. Over defense counsel's objection, Judge Weinstein permitted that testimony to be introduced. Molese also testified at the trial as to the parts that Famulari and Mattei had played in the robbery. Siciaranno was not tried with them. Neither appellant testified in his own behalf.

---

1. Judge Weinstein stated:
   "I think on the evidence you can't say that the Government arranged this. We have a physical situation. The witness is waiting in the corridor. The Government knows my position with respect to witnesses. I like them to move in quickly. I don't like them to be kept at a distance where it takes a substantial length of time."

2. See note 4, *infra.*

3. He stated in full:
   "I think it's doubtful whether an exclusion is required under Wade of this identification just outside the courtroom

as the witness is about to enter, because I think most judges now who are trial judges recognize that the in-court identification is practically useless. It very often is a formality so that the critical aspect is not whether or not he looks into the door or he saw him for the first time in the Courtroom—that doesn't make much difference—the critical aspect is that both of those are suspect. But I think out of caution and because of the language of Wade and the possibility that there was a defect here, I may keep out the Courtroom identification."

Famulari's main argument on this appeal is that Lamont's in-court identification of him should have been excluded as based on a prior identification deliberately staged by the government at which counsel was not present. According to Famulari, that prior identification—through the courtroom door—constituted an impermissible show-up under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1966), which requires the presence of counsel at pre-trial identification proceedings, and thus made the in-court identification inadmissible. In support of this contention, Famulari cites United States v. Roth, 430 F.2d 1137, 1140–1141 (2 Cir. 1970), cert. denied 400 U.S. 104, 91 S.Ct. 583, 27 L.Ed.2d 633 (1971), where we found that the *Wade* requirement was violated where the witness, at the suggestion of the prosecutor, walked through the courtroom during a recess to see whether he could identify the defendant. Famulari claims that Judge Weinstein's instruction to the jury to disregard the in-court identification here could not possibly have cured the prejudice already done, and that the judge should therefore have declared a mistrial.

We reject this argument. At the outset, it is not at all clear that the identification through the courtroom door was a confrontation "arranged by the Government," as is necessary for the *Wade* requirement to apply. United States v. Roth, *supra,* at 1140. Judge Weinstein made no such finding, and in fact, Lamont testified on cross-examination that, as he waited, he voluntarily looked through the window in the courtroom door to see whether he could identify any defendant:

> "Q. And then you decided to look through the window to see whether you would recognize this man whose picture you saw a few—a short while ago; is that correct? A. Right."

Famulari points to the following colloquy later in the cross-examination of Lamont:

> Q. "And when Mr. Lombardino [the Assistant United States Attorney] showed you the picture in the office, you again said, 'I couldn't be sure'? A. Right.
>
> Q. "But you were asked to look and see whether, looking at him, you would be sure? A. Right.
>
> Q. "Right?
>
> "Mr. Lombardino asked you to do that? A. Yes."

This colloquy, however, could just as well indicate that, in anticipation of his courtroom appearance, Lamont was told that Famulari would be in the courtroom and that he would see him and should decide whether he could be more certain of his identification. Lamont did not testify that he was at any time told to look through the window of the courtroom door. In light of these ambiguities, we cannot say that the courtroom door identification was deliberately staged by the government.

██ Moreover, *Wade* does not automatically mandate the exclusion of an in-court identification merely upon a showing that a prior identification had taken place in the absence of the defendant's lawyer. The in-court identification is still admissible if it can be shown that that identification did not result from the "exploitation" of the "primary illegality," but would have been made even if the improper identification had not taken place. United States v. Wade, *supra,* 388 U.S. at 241, 87 S.Ct. 1926; United States v. Roth, *supra,* 430 F.2d at 1141.

██ Although Judge Weinstein made no finding on this issue, it seems to us impossible, given the circumstances under which the pre-testimonial identification was made, to conclude that Lamont would not have made the same identification from the witness stand. Except for the facts that he viewed Famulari from one side of the room rather than another and that the jury could not see him viewing Famulari, the setting for the courtroom door identification

was identical to the setting in which the courtroom identification was made, and the in-court identification was virtually contemporaneous with the pre-testimonial identification. Famulari himself conceded at trial that, had the identification been made from the witness stand, it clearly would have been proper; and his counsel stated: "Now the only —the only item that makes it—raises some question that has to be considered and argued about here is that he did it just before he testified. And perhaps one might say on the side of the Government that he was going to come in anyway."

Thus, this was not a case in which a witness may have felt some compulsion to stick to an earlier identification even though he might not really have been sure of his identification in the courtroom. United States v. Wade, *supra,* 388 U.S. at 229, 87 S.Ct. 1926. Indeed, Lamont's continued insistence that he could not be sure of the photographic identification, even when he found out that the man he had picked out was named as a defendant and was implicated by an accomplice, indicates that he was not a person readily susceptible to suggestive influences.

In sum, the allegedly improper identification was so related in time and circumstance to the in-court identification that it cannot be said to have tainted Lamont's testimony or infected the trial. United States v. Roth, *supra,* 430 F.2d at 1141. Hence, even if the courtroom door identification was deliberately staged, the in-court identification was admissible in the circumstances of this case.

■ In any event, even assuming that the initial admission of the in-court identification was error, we believe the alleged error harmless. Judge Weinstein gave extensive instructions to the jury as to why he was charging them to disregard that identification, and he explained in detail why the in-court identification was entitled to little probative value.[4] In addition, Molese's testimony inculpating Famulari was detailed and uncontroverted; and it was corroborated by Lamont's testimony—which Judge Weinstein *did* admit—that he had picked Famulari's photograph from a large group and had found it similar to the robber he had seen in the bank. In light of this strong evidence of Famulari's guilt, we believe beyond a reasonable doubt that the verdict would have been the same whether or not Lamont's in-court identification was admitted. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ Famulari's second argument is that it was error to permit Lamont to testify that he had picked Famulari's photograph from the group of twenty or thirty. Judge Weinstein stated that he would have admitted this testimony even if the in-court identification had been totally excluded. Famulari's brief con-

---

4. Judge Weinstein told the jury:

"You recall last night, shortly before we broke, that Mr. Lamont testified with respect to the identification of one of the defendants. I am going to ask you to strike from your minds and not to consider his testimony from the witness stand that he identified this defendant in the courtroom and recognized him in the courtroom; and that he identified him from the corridor as he was looking through the door. Now, that may seem a little strange to you, but I want to explain why. When you identify somebody, the identification may very well often depend upon surrounding circumstances. And if you are looking for somebody, you may tend to see what you expect to see. Therefore, the fact that the identification took place while this defendant was in a defendant's position, sitting at the witness table, in a sense, taints that identification because it's too suggestive, and because of the difficulties, the lack of probative force and other reasons which I will not now explain to you, I don't want you to consider that identification either from the witness stand or from the corridor as he was looking in. Is that clear? Strike that from your minds."

After completing this instruction, the judge polled each juror individually, and each indicated that he could follow the instruction.

**1382**

tends that "[a]lthough it is true that this Appellate Circuit has taken a more liberal view [than the New York courts] in allowing evidence of prior identification, United States v. Forzano, 190 F.2d 687 (2 Cir. 1951); United States v. Miller, 381 F.2d 529 (2 Cir. 1967), it has not done so in a situation of a pre-trial selection of a photograph which can only be described as being 'similar'."

We cannot see why the rule should be any different in the latter case. Certainly such evidence is highly relevant. As Judge Weinstein observed:

> "I don't see how we can avoid it. I am certainly not going to take the position in these criminal cases that evidence which is highly probative, showing that a man who was present at a crime and observed a perpetrator, and who picked out of a whole group of pictures a man because of certain characteristics, shouldn't come in. This is highly useful evidence and it doesn't seem to me that we can hamstring prosecutions in this way."

We agree and conclude therefore that the evidence of Lamont's prior photographic identification was properly admitted. See United States v. Roth, *supra*, 430 F.2d at 1140, where we upheld a witness' testimony that he had picked from a group of photographs the one "looking most like [the defendant]."

Famulari's third point is that the evidence was insufficient to sustain his conviction. After reviewing the record, we find this contention to be plainly without merit. Cf. United States v. Corallo, 413 F.2d 1306, 1323 (2 Cir.), cert. denied 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969).

Mattei's sole contention here is that, in light of the fact that the only evidence implicating him was Molese's testimony, the district court's charge did not adequately caution the jury as to the possible untrustworthiness of an accomplice's testimony, particularly where the accomplice had made a "deal" with the government. According to Mattei, the court's charge in this respect con-

tained nothing more than "soporific bromides," "homely commonplaces," and "familiar nostrums," where stronger medicine was needed.

 This contention is frivolous. Judge Weinstein's charge on accomplice testimony was wholly adequate, and indeed stronger than that which we sustained in United States v. Corallo, *supra*, at 1322. Both before and after the charge, the judge gave counsel an opportunity to make specific requests and to take exceptions. Neither defendant voiced objection. Under these circumstances, the charge hardly constituted plain error and Mattei's contention is not available on appeal. Rule 30, Federal Rules of Criminal Procedure.

Affirmed.