STATE OF NEBRASKA, APPELLEE, V.
KIMBERLY SUE FAUST, APPELLANT.
696 N.W.2d 420

Filed May 6, 2005.   No. S-04-298.

James R. Mowbray and Jeffrey A. Pickens, of Nebraska Commission on Public Advocacy, and Timothy W. Nelsen, Otoe County Public Defender, for appellant.

Jon Bruning, Attorney General, and Jeffery J. Lux for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

On April 25, 2000, Shannon Bluhm and Robert Parminter were killed on an Otoe County road. The appellant, Kimberly Sue Faust, was charged in the deaths and convicted of two counts of first degree murder and two counts of use of a weapon to commit a felony. On appeal, we reversed those convictions because the jury had been "exposed to a significant amount of improper and prejudicial testimony." *State v. Faust*, 265 Neb. 845, 849, 660 N.W.2d 844, 855 (2003). Faust was retried and convicted of one count of first degree murder, one count of second degree murder, and two counts of use of a firearm to commit a felony. Faust's motion for new trial was denied, and she appeals.

## TRIAL EVIDENCE

The bodies of Bluhm and Parminter were found by the side of a road near Parminter's house, near Bluhm's burning car. Parminter was killed attempting to rescue Bluhm from the

burning automobile. Parminter died of at least two gunshot wounds to the head; Bluhm had stab wounds to the chest and gunshot wounds to the back of the head and to the back.

According to the State's evidence, Bluhm had been intimately involved with Faust's husband, Bruce Faust (Bruce). The parties agree that on April 25, 2000, Faust placed her bicycle into her Jeep Cherokee and drove to a county road near a paved highway, where she parked the Jeep, and from where she rode the bicycle into Eagle, Nebraska. Faust then testified that she arrived in Eagle at about 9:15 or 9:20 p.m. Faust came across Bluhm in Eagle and accepted Bluhm's offer of a ride back to Faust's Jeep. From there, the parties' accounts differ.

Faust testified at trial on January 7, 2004. According to Faust, when they arrived at the Jeep, Bruce was there and got into Bluhm's car on the driver's side. Faust claimed that Bruce was yelling at her, so she ran from the car to her Jeep and drove off. Faust said that she stopped and turned on the Jeep's dome light to look for her mobile telephone and that she saw that her pant leg was soaked in blood, although Faust herself was not bleeding. She testified that she reached under her seat looking for her telephone, but found a revolver that she had borrowed from her father and not yet returned. Faust testified that she accidentally fired the revolver inside the Jeep.

Faust said that she drove back toward Bluhm's car, which was then on fire, and saw someone lying on the road and another person standing nearby. According to Faust, she got out of her car and knelt next to the person in the road, who was Bluhm. Faust said that Bruce then grabbed her hair and began firing a gun. Faust claimed that Bruce tried to shoot her in the head, but that this time, the gun did not fire. Faust said that Bruce then threatened Faust and threw the gun to the ground. Faust testified that she picked up the gun, got in her Jeep, and drove home, where she burned her bloody clothing.

On cross-examination, the State questioned Faust about whether she was outside Bluhm's salon in Eagle at 8:45 p.m.

> Q. And the next time that you was [sic] in Eagle, Nebraska, then, was, according to your statement, was at about approximately 9:20 p.m. when you're pushing your bike?

A. Correct.

Q. Did you ever drive your Jeep Cherokee back to Eagle, Nebraska, between 7 p.m. and 9:30 p.m.?

A. Not that I recall.

Q. Okay. Well, wouldn't you know if you did or didn't?

A. I don't believe I did.

Q. Were you sitting outside of Shannon Bluhm's shop in your Jeep Cherokee at about 8:45 p.m.?

A. No.

Q. You're absolutely sure of that?

A. Yes.

The State later asked Faust:

Q. And you're absolutely sure that you were not sitting in your Jeep Cherokee at about 8:45 p.m., looking at Shannon's shop?

A. No, I wasn't.

Q. And I'm talking about the night of April 25 of 2000, when all this happened, you weren't there?

A. No, I wasn't.

The reason for this line of questioning was that on January 1, 2004—a week before Faust's trial testimony—an investigator with the Nebraska State Patrol became aware of and interviewed Belva Anderson, who had been a customer at Bluhm's salon on April 25, 2000. Anderson was called by the State as a rebuttal witness and testified that she had left Bluhm's salon on April 25 at 8:45 p.m. Anderson testified that as she went out the front door, she saw a Jeep that was parked "so close to the door that [she] had a hard time getting out." Anderson testified that there was one person in the Jeep and positively identified Faust as the person behind the steering wheel of the Jeep. Anderson was cross-examined with respect to the length of the sidewalk and the number of parking spaces near the salon, but the credibility of her in-court identification was not directly challenged by cross-examination at trial.

## MOTION FOR NEW TRIAL

As previously noted, Faust was convicted pursuant to jury verdict, and Faust filed a motion for new trial. At the hearing on the motion for new trial, Faust called Anderson as a witness. Faust first examined Anderson with respect to the layout of the salon,

sidewalk, and parking lot as she recalled it on April 25, 2000. Anderson then said that she had thought that the person she had seen in the Jeep on April 25 had short, blonde hair and blue eyes, but that at trial, Faust had longer, brown hair and brown eyes.

Anderson was then examined with respect to a picture of Faust that Anderson had seen in the Hastings, Nebraska, newspaper prior to Anderson's trial testimony. Anderson said that she had seen the photograph prior to being contacted by law enforcement and that in the photograph, Faust had more closely resembled her appearance at trial as opposed to her appearance in April 2000. In other words, Anderson testified that she knew, prior to her in-court identification of Faust, that Faust had longer, brownish-colored hair. Anderson testified that she had been able to identify Faust at trial "[b]ecause [Anderson] trimmed [Faust's] hair and bleached, it in [Anderson's] mind." Anderson said that she had not been "bother[ed]" by the eye color problem because she had not been "100 percent sure . . . that [Faust's] eyes [had been] blue." Anderson insisted that she was "100 percent sure when [she] testified that that was [Faust]."

Anderson testified that when she was interviewed by law enforcement prior to trial, she had been shown a photograph of Faust's Jeep and had told law enforcement that she recalled the Jeep she saw outside Bluhm's salon as being darker in appearance, but that "it was dusk, you know." Faust then continued her attacks on inconsistencies between Anderson's recollection and the actual physical surroundings of the salon. Anderson still maintained, when asked if she was certain that the person she identified in court was the person she saw on April 25, 2000, "I swear to God. I'm sure."

Anderson then testified about meeting with a defense investigator on February 7, 2004, after she had testified at trial. Anderson admitted that at the time of the interview, she had expressed uncertainty about her prior in-court identification. Anderson said that she had "agonized over this" and "second-guessed" herself. Anderson said, however, that she had become certain again after law enforcement, on February 11, had shown Anderson a photograph of Faust on the night Faust had been arrested. Anderson said that seeing Faust in court, she again had "no doubts."

Faust then examined the criminal investigator from the Nebraska State Patrol who had located and made the initial contact with Anderson. The investigator testified that he had located Anderson after examining Bluhm's appointment book from April 25, 2000, and had interviewed Anderson on January 1 and 2, 2004. The investigator testified that he had not shown Anderson a photograph of Faust prior to Anderson's trial testimony. The investigator testified that he had shown Anderson a photograph of Faust's Jeep on the day of Anderson's trial testimony, as described by Anderson. The investigator said that Anderson had advised him that "she recalled the Jeep being a darker color, and then she also stated that it was dusk, so she was unsure of the color, but she was sure of the make."

The investigator then testified that he asked Anderson to make an identification of Faust on the morning of Anderson's trial testimony. Anderson was asked to take a seat in the courtroom gallery, to see if she could identify Faust as being in the courtroom. The investigator testified that Faust was not in the courtroom at that time. He then left the courtroom. Anderson then emerged from the courtroom and advised the investigator that she was able to recognize Faust. The investigator returned to the courtroom and saw Faust, separated from the gallery by the courtroom bar. Faust was the only woman seated at counsel table. The investigator testified that Faust was wearing civilian clothing and that he had not advised Anderson what entrance into the courtroom Faust would use. The investigator also said that on February 11, 2004, after trial, he had shown Anderson three booking photographs of Faust.

Anderson was then recalled to the stand. Anderson testified that prior to her trial testimony, she had been seated in the courtroom gallery and had seen Faust when she walked in. Faust had come into the courtroom through a different entrance from the public entrance, escorted by a man. Anderson said that Faust had been seated at counsel table with three men.

The district court overruled Faust's motion for new trial. Faust has perfected this timely appeal.

## ASSIGNMENT OF ERROR

Faust assigns that the district court erred in overruling her motion for new trial. In her brief, Faust argues that the motion for

new trial should have been granted because of (1) witness misconduct on the part of Anderson, (2) prosecutorial misconduct in using a suggestive identification technique and failing to inform Faust of that technique, and (3) newly discovered evidence, i.e., evidence of Anderson's and the prosecution's misconduct.

## STANDARD OF REVIEW

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Shipps,* 265 Neb. 342, 656 N.W.2d 622 (2003). See *State v. Boppre,* 243 Neb. 908, 503 N.W.2d 526 (1993). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. King, ante* p. 326, 693 N.W.2d 250 (2005).

## ANALYSIS

Neb. Rev. Stat. § 29-2101 (Cum. Supp. 2004) provides, in relevant part:

> A new trial, after a verdict of conviction, may be granted, on the application of the defendant, for any of the following grounds affecting materially his or her substantial rights: . . . (2) misconduct of the jury, of the prosecuting attorney, or of the witnesses for the state . . . (5) newly discovered evidence material for the defendant which he or she could not with reasonable diligence have discovered and produced at the trial[.]

Faust's first two arguments are based on alleged witness and prosecutorial misconduct; her third argument is based on alleged newly discovered evidence. We address each argument in turn.

### WITNESS MISCONDUCT

Faust's first argument is that Anderson committed witness misconduct when she made her in-court identification of Faust. The sole authority cited by Faust in support of this argument is *State v. Tainter,* 218 Neb. 855, 359 N.W.2d 795 (1984), in which the defendant introduced collateral evidence to attack the credibility of the police officer who had administered the defendant's breath alcohol test. The officer denied having, on another

occasion, removed evidence from the police evidence room for other than law enforcement purposes, but the defendant adduced evidence that the officer had previously been suspended for such conduct. We stated:

> The defendant seems to have a theory that an incorrect or false statement by a witness for the State about his own past misconduct on the job somehow invalidated the results of the breath test.

> The fact that a witness may have lied about a past act does not invalidate the rest of his testimony. It only means the jury must weigh these statements against the rest of the evidence in reaching a verdict. . . . This court will not reexamine or pass on the trier of fact's determination of credibility. . . .

> . . . .

> The misconduct of the State's witness here was insufficient to materially affect the defendant's substantive rights. As pointed out in the early case of *Argabright v. State*, 62 Neb. 402, 87 N.W. 146 (1901), which dealt with misconduct of an attorney at trial, to warrant reversal the misconduct must be of such a nature as to unduly influence the decision of the jury. Here, there was no undue influence.

(Citations omitted.) *State v. Tainter*, 218 Neb. at 859-60, 359 N.W.2d at 798.

■ Clearly, the issue presented in *Tainter* has no bearing in the instant case. Faust's entire argument with respect to "witness misconduct" is that Anderson committed misconduct when she purportedly made an unreliable identification of Faust at trial, because, according to Faust, Anderson's in-court identification was tainted by her observation in the courtroom prior to testifying and her viewing of Faust's photograph in the newspaper prior to trial. But the record does not suggest, nor does Faust argue, that Anderson's trial testimony was deliberately false. In other words, Faust argues that Anderson committed misconduct because her testimony was not credible. But witness credibility is not to be reassessed on appellate review, *State v. McPherson*, 266 Neb. 734, 668 N.W.2d 504 (2003), and reframing the issue as "witness misconduct" does not change this well-established principle. Faust's appellate argument does not support a finding

of witness misconduct. The district court did not abuse its discretion in rejecting this basis for Faust's motion for new trial.

## PROSECUTORIAL MISCONDUCT

Next, Faust argues that there was prosecutorial misconduct in using a suggestive identification technique—specifically, Anderson's observation in the courtroom prior to testifying—and failing to inform Faust of the use of that technique. Faust contends that Anderson's in-court identification of Faust was irreparably tainted by the allegedly suggestive identification made in the courtroom prior to her testimony, based upon the constitutional standards for suggestive identifications that have been articulated by this court and the U.S. Supreme Court. Consequently, in order to evaluate Faust's claim of prosecutorial misconduct, the first step is to consider, pursuant to those standards, whether the in-court identification was actually rendered unreliable by the allegedly suggestive identification technique used by the State.

An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law. *State v. Carter*, 241 Neb. 645, 489 N.W.2d 846 (1992). The initial inquiry is whether an identification procedure was suggestive. *Id.* A determination of impermissible suggestiveness is based on the totality of the circumstances. *Id.* Furthermore, even if there have been impermissible pretrial suggestions as to an accused's identity, in-court identification may be received when it is independent of and untainted by the impermissible identification procedures. *Id.*

Reliability is the linchpin in determining the admissibility of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). The factors to be considered include (1) the opportunity of the witness to view the alleged criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his or her prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. *Id.*, citing *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). Against these factors is to be weighed the corrupting influence of the suggestive identification itself. *Manson v. Brathwaite, supra.*

Admittedly, application of the factors enumerated in *Manson v. Brathwaite, supra,* is not particularly supportive of Anderson's in-court identification. According to Anderson's testimony regarding the events of April 25, 2000, she observed the person she identified as Faust for approximately 5 to 10 seconds. The record does not establish the degree of attention that Anderson gave to her observation of Faust, although it was clearly not the attention that might be expected from a trained observer, or someone who knew that her observations might be subject to later scrutiny. Compare *id.* Anderson provided no prior description of the person she observed that can be evaluated for accuracy. Anderson's in-court identification was made more than 3½ years after her observations outside Bluhm's salon.

However, Anderson did testify that she noticed the person particularly because of the unusual way in which the person's vehicle was parked and that she was positive of the time that the incident occurred. Anderson was candid about the details of the incident that she could remember and those she could not, and overall, her trial testimony demonstrated a high level of certainty in her observations and identification. Compare *id.* Anderson's testimony, as she explained it at trial and at the motion for new trial, was based on the observations she made on April 25, 2000. See, *State v. Sanders,* 235 Neb. 183, 455 N.W.2d 108 (1990); *State v. Trevino,* 230 Neb. 494, 432 N.W.2d 503 (1988).

More importantly, as previously noted, these factors are to be weighed against the corrupting influence—if any—of the allegedly suggestive identification. See *Manson v. Brathwaite, supra.* In this case, the pretestimonial identification at issue was not so suggestive as to undermine the reliability of Anderson's in-court identification. As stated by the U.S. Court of Appeals for the Eighth Circuit, "[t]o inquire of a witness in a nonleading fashion, shortly before she takes the stand, whether she can identify a person, which is the same question she will be asked while testifying, is not a procedure that we believe to be impermissibly suggestive." *United States v. Wade,* 740 F.2d 625, 628 (8th Cir. 1984). "[W]here the witness confronts the defendant, prior to testifying, in substantially the same circumstances in which he would have encountered him from the witness stand, his in-court identification cannot be said to have been infected

by the pre-testimonial identification." *United States v. Williams*, 596 F.2d 44, 49 (2d Cir. 1979). See, also, *United States v. Domina*, 784 F.2d 1361 (9th Cir. 1986); *United States v. Famulari*, 447 F.2d 1377 (2d Cir. 1971); *Middleton v. United States*, 401 A.2d 109 (D.C. 1979); *Com. v. Sexton*, 485 Pa. 17, 400 A.2d 1289 (1979); *People v. York*, 189 Colo. 16, 537 P.2d 294 (1975).

*United States v. Famulari, supra*, presents an analysis that is instructive in the instant case. In *Famulari*, a witness was unsure of his identification of the defendant from a photograph and looked through the window in the courtroom door to see whether he could identify any defendant. The parties disagreed about whether the witness had been asked by the prosecutor to look through the window. However, on appeal, the Second Circuit concluded that even if the courtroom door identification had been deliberately staged, the in-court identification was admissible. The court reasoned that the in-court identification was still admissible if it could be shown that the "identification did not result from the 'exploitation' of the 'primary illegality,' but would have been made even if the improper identification had not taken place." *Id.* at 1380, quoting *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967).

Except for the fact that the witness had viewed the defendant from one side of the room rather than the other and that the jury could not see him viewing the defendant, "the setting for the courtroom door identification was identical to the setting in which the courtroom identification was made, and the in-court identification was virtually contemporaneous with the pre-testimonial identification." *United States v. Famulari*, 447 F.2d at 1380-81. "[T]his was not a case in which a witness may have felt some compulsion to stick to an earlier identification even though he might not really have been sure of his identification in the courtroom." *Id.* at 1381. In sum, the court concluded that "the allegedly improper identification was so related in time and circumstance to the in-court identification that it cannot be said to have tainted [the witness'] testimony or infected the trial." *Id.* Accord *United States v. Hamilton*, 469 F.2d 880 (9th Cir. 1972).

Similarly, it is difficult to conclude that the identification techniques at issue in the instant case were impermissibly suggestive,

when the alleged taint of the in-court identification is derived from circumstances substantially indistinguishable from the in-court identification itself. Anderson sat in the courtroom, saw Faust enter the room and sit at counsel table, and identified Faust as the person she saw on April 25, 2000. Later, Anderson took the witness stand, saw Faust at counsel table, and identified her as the person she saw on April 25. In short, the pretestimonial identification was so related in time, place, and circumstances to the in-court identification that we cannot conclude the in-court identification was tainted.

We also rejected an argument similar to Faust's in *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998). In *Jacob*, a coworker and tenant of a murder victim identified the defendant, Steven Jacob, at a retrial following a reversed conviction, as being the driver of a vehicle that passed the victim's residence shortly after the murder. The witness had also identified Jacob at a pretrial hearing before the first trial. We rejected Jacob's argument that the in-court identification was tainted.

[Jacob] argues that the trial court erred in allowing [the witness'] identification testimony into evidence. Jacob asserts that [the witness'] testimony is unreliable, is the result of a suggestive "showup" at the preliminary hearing for the first trial, and is based on seeing Jacob identified as a suspect on television and in the newspaper. Prior to trial, the court overruled Jacob's motion to suppress the eyewitness identification . . . based upon its alleged suggestive nature. The court again overruled an objection to [the witness'] identification during trial.

During trial, [the witness] testified that when he saw a picture of Jacob on the news, he called the police to tell them that he had seen that person drive by shortly after the shooting. He clarified, however, that his testimony identifying Jacob as the man who drove by was based on what he saw while standing in front of the neighbor's house. The admissibility of evidence is reviewed for an abuse of discretion where the Nebraska Rules of Evidence commit the evidentiary question at issue to the discretion of the trial court. . . . The trial court did not abuse its discretion in allowing [the witness'] testimony.

(Citation omitted.) *State v. Jacob*, 253 Neb. at 981-82, 574 N.W.2d at 141.

The same principles apply in the instant case. As previously stated, the identification technique at issue in this case was not unduly suggestive. Beyond that, even had it been, in-court identification may be received when it is independent of and untainted by the impermissible identification procedures. *State v. Carter*, 241 Neb. 645, 489 N.W.2d 846 (1992). The evidence adduced at trial and at the hearing on the motion for new trial indicates, clearly, that Anderson's testimony was based upon her observations of April 25, 2000. Simply stated, the identification technique used by the State did not taint Anderson's in-court identification, and Anderson's in-court identification was properly admitted in any event.

Faust also argues that had the pretestimonial identification been disclosed, she would have been better prepared to cross-examine Anderson and discredit her in-court identification. However, we conclude that the district court did not abuse its discretion in finding that Faust had not been prejudiced by the lack of disclosure. Faust's argument rests on the contention that Anderson's in-court identification could have been undermined had she been subject to cross-examination about seeing Faust in the courtroom before testifying. However, as discussed above, the circumstances of the pretestimonial identification did not undermine the reliability of the in-court identification, because the time, place, and circumstances of each identification were nearly identical.

Whether prosecutorial misconduct is prejudicial depends largely on the facts of each case. *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998). The conduct of a prosecutor which does not mislead and unduly influence the jury and thereby prejudice the rights of the defendant does not constitute misconduct. *State v. Shipps*, 265 Neb. 342, 656 N.W.2d 622 (2003). Under the circumstances of this case, cross-examining Anderson with respect to the pretestimonial identification would not have discredited her in-court identification, and there was not a " ' " " 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " ' " See *id.* at 354, 656 N.W.2d at 633. The district court did not abuse its discretion in failing to grant a new trial on this basis.

NEWLY DISCOVERED EVIDENCE

Faust's remaining argument with respect to her motion for new trial is that the alleged misconduct of Anderson and the State was newly discovered evidence warranting a new trial. Having rejected Faust's claims with respect to that misconduct, we also conclude that the district court did not abuse its discretion in finding no newly discovered evidence warranting a new trial.

In order for a new trial to be granted, it must be shown that a substantial right of the defendant was adversely affected and that the defendant was prejudiced thereby. *State v. Hudson*, 268 Neb. 151, 680 N.W.2d 603 (2004). A criminal defendant who seeks a new trial on the basis of newly discovered evidence must show that if the evidence had been admitted at the former trial, it would probably have produced a substantially different result. *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004). Even if we assume, for the sake of argument, that Faust was reasonably diligent in discovery of this evidence, see *State v. Van*, 268 Neb. 814, 688 N.W.2d 600 (2004), we conclude, based on our analysis above, that this evidence was insufficient to demonstrate that had it been admitted at trial, it would probably have produced a substantially different result. The district court did not abuse its discretion in denying Faust's motion for new trial on the basis of newly discovered evidence.

CONCLUSION

The district court did not abuse its discretion in overruling Faust's motion for new trial. The judgment of the district court is affirmed.

AFFIRMED.