UNITED STATES of America, Appellee,

v.

**Earl WILLIAMS, Appellant.**

**No. 448, Docket 78–1322.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 20, 1978.

Decided March 14, 1979.

---

Judith Pierce, Brooklyn, N.Y., Asst. U.S. Atty. (Edward R. Korman, U.S. Atty., E.D. N.Y., Harvey M. Stone, Mary McGowan Davis, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for appellee.

Michael A. Corriero, New York City, for appellant; Donald E. Nawi, New York City, of counsel.

Before FEINBERG, MULLIGAN and GURFEIN, Circuit Judges.

MULLIGAN, Circuit Judge:

Earl Williams was convicted by a jury after a trial before the Hon. Henry Bramwell, United States District Judge, Eastern District of New York, of conspiracy to commit bank robbery and attempted bank robbery, in violation of 18 U.S.C. § 371, and 18 U.S.C. §§ 2113(a), (d) and 2. Appellant received a twenty year sentence on the two merged bank robbery counts of the indictment.[1] Sentencing on the conspiracy count was suspended, and the defendant was placed on probation for a period of five years. The trial court indicated that the probationary term is consecutive to the twenty year sentence, and that all sentences are consecutive to the four and one half year sentence appellant is presently serving in Lexington, Kentucky on an unrelated conviction.

## I. THE FACTS

The principal witness for the Government in this case was Sister Patricia Sweeney, a nun affiliated with the Sisters of St. Joseph who served as an area coordinator for the four Catholic schools of Bedford Stuyvesant. On the morning of October 6, 1975, "somewhere between 9:30 and 10:45," Sister Sweeney went to a branch of the Manufacturers Hanover Trust Company, located at

---

1. Williams was indicted in one count for an "attempt to take from the person and presence of employees of the Manufacturers Hanover Trust Company . . . money which was in the care, custody, control, management and possession of the said Manufacturers Hanover Trust Company" by the use of force, violence,

and intimidation. The second count charged that, in the course of the attempt, Williams "did assault and place in jeopardy the lives of the said bank employees, as well as the lives of other persons present by the use of a dangerous weapon."

971 Bedford Avenue in Brooklyn, to cash a check. She parked her car on DeKalb Avenue opposite the bank and directly behind a blue Buick with a black vinyl top which was occupied by three black men and bore a North Carolina license plate. Sister Sweeney observed the three men leave the car, two of them wearing straw hats, and the other man wearing "black, basically." Sister Sweeney watched one of the men (later identified as Williams) wearing a light colored wide-brim hat walk over to the old bank across the street from Manufacturers Hanover and place a paper bag with a bottle in it close to the wall of the old building.[2] Sister Sweeney then observed the three men "staring up at the bank . . and then they walked across DeKalb Avenue and passed in front of the bank and then I lost view of them." At that point, Sister Sweeney decided to move her car and circled the area three times looking for a place to park her car. Once she had parked the car, Sister Sweeney crossed the street, "looked into the bank to see if everything was calm," and then went in and cashed her check. As she was leaving, Sister Sweeney testified that the same three men who had arrived in the blue car were coming into the bank. The men, who were not wearing masks at that time, "passed right by" her. Soon after, Sister Sweeney heard shots ring out and observed one of the three men wearing a straw hat run "along the side of the bank going east." Sister Sweeney then left the area, but returned about an hour and a half later and pointed out to FBI Agent Jerry Loar the bottle wrapped in a brown bag which was still lying where one of the men had placed it against the build-

ing across the street from the bank. Agent Loar sent this evidence to Washington where it was processed and three latent prints were retrieved. Williams' fingerprint matched the latent print developed on the paper bag.

At trial, James Rubens, Branch Manager of the bank, testified that three men wearing stocking masks and hats entered the bank on October 6, 1975 and announced, "This is a holdup, freeze." All tellers in the bank hid under the counter, while Rubens was left standing in the tellers' area. Rubens observed one of the men wearing a black coat fire a shot at him. Rubens then dove under the counter and pulled the alarm. From there, he observed one of the holdup men wearing a white hat and standing by one of the teller's windows. Moments later, Rubens heard another shot. After a few more minutes, the three holdup men left the bank without obtaining any money.

At trial, Rubens and Sister Sweeney were shown bank surveillance photos depicting a man in a wide-brim light colored straw hat, and another man wearing a tight knitted hat and black coat and carrying a shotgun. Rubens identified the individuals as the holdup men. Sister Sweeney testified that the persons portrayed in the surveillance photos were the same men she had seen leaving the blue car. She also identified the man in the surveillance photos wearing the light colored straw hat as the individual who had placed the bottle and bag near the old bank. Sister Sweeney further identified Williams in court as one of the three

---

2. Sister Sweeney further described Williams as follows:

   A. Well I remember that this individual was rather tall and he was wearing a straw hat with a wide brim and he was well dressed.
   Q. Do you recall what his weight was, approximately?
   A. I would say maybe about, about a hundred and fifty.
   Q. So he was slim?
   A. Yes, slim.

   Tr. at 85.

   With respect to the other two men, Sister Sweeney recalled that:

   One of the other two men was wearing a straw hat. His was like a beige hat. He was also rather tall and slim, I'd say maybe five ten, maybe about the same weight, about a hundred and fifty.

   And the third man was shorter. He maybe was five seven, I would say, and he was wearing a tight-knitted hat to his head and he was wearing a very dark coat, I believe it was black, and it was a three quarter length coat and he had a big bulge in the back pocket.

   Tr. at 85.

men she had seen on the morning of October 6, 1975.[3]

On cross-examination, Sister Sweeney recalled that on February 1, 1978, FBI agents had showed her two bank surveillance photos similar to those used on direct examination, and that although she could not positively identify the faces as those of the men she had seen on the morning of the attempted robbery (the facial features in the photos were obscured by stocking masks), she was certain that the apparel of the persons portrayed in the photos was the same as that of the men she had seen. Sister Sweeney also testified that on September 6, 1977, FBI agents showed her an array of six photographs and that she had been unable to identify any of the men depicted in those photographs as one of the persons she had seen on the day of the attempted robbery because she "thought the skin was too light on some of those." The Government stipulated that a photograph of Williams had been included in the photo spread shown to Sister Sweeney.

One of the central issues on this appeal is whether Sister Sweeney should have been permitted to make an in-court identification of Williams as the man she had seen with the bag and bottle on the morning of the attempted robbery. Defense counsel had argued at trial that such an identification would be "tainted" by the fact that Sister Sweeney had viewed the defendant in the courtroom shortly before she was scheduled to testify on June 27, 1978, the second day of trial. At a hearing on the issue, Sister Sweeney related that since she was to be the Government's first witness on the second day of trial, she followed the Assistant United States Attorneys into the courtroom that morning, after inquiring of someone in the hallway as to what she should do:

I had been standing out in the hall and I don't even remember, I guess I was nervous. Someone said it was alright to sit in the back seat there, and that was all I did.

The record is clear and defense counsel himself conceded that the confrontation between Sister Sweeney and Williams was not arranged by the Government.[4] Defense counsel noticed that Sister Sweeney had been sitting in the back of the courtroom for approximately ten minutes while Williams was seated next to him at the counsel table. Counsel asked the prosecutor whether she intended to elicit an in-court identification from Sister Sweeney. The prosecutor replied that she did not since Sister Sweeney had failed to identify Williams from a photo spread. At that point, the prosecutor approached Sister Sweeney, asked her to leave the courtroom, and indicated to her that she might "be called to recollect the physical description of the person who got out of the car with the bottle and the bag." Defense counsel also questioned Sister Sweeney at that time as to whether she could identify the man whom she had seen sitting next to him at the counsel table. Sister Sweeney answered that Williams was one of the three men she had seen on the morning of the attempted robbery.

At the conclusion of the hearing, the court found that Sister Sweeney's accidental courtroom confrontation with Williams was not unduly suggestive, and that defense counsel, in questioning the witness immediately after the confrontation, was responsible for any suggestiveness that resulted from the incident. The court further concluded that Sister Sweeney had indepen-

---

3. Sister Sweeney identified Williams in court as follows:

   Q. Sister Sweeney, I am going to ask you at this point to look around the courtroom, and I am going to ask you whether or not you see in the courtroom today anyone that you saw on October 6, 1975, the morning of October 6, 1975?
   A. Yes, yes.
   Q. Can you indicate who that is?
   A. Yes, the black gentlemen over here.

   Mr. Corriero: The record will reflect the witness is pointing to the defendant, Earl Williams.
   Tr. at 94–95.

4. Defense counsel stated at the hearing on the courtroom confrontation: "I am not suggesting that it was done deliberately by the United States Attorney having her sit there." Tr. at 61.

dently identified Williams as the man she had seen even before defense counsel questioned her concerning the confrontation.

After identifying Williams from the witness stand as the man she had seen on the morning of the attempted robbery, Sister Sweeney testified on cross-examination that she had observed Williams in the courtroom seated next to his attorney and that she had surmised that he was the accused. However, Sister Sweeney consistently maintained even on cross-examination that she was 90% certain that Williams was the man she had seen both inside and outside the bank on the day of the attempted robbery.

With respect to the identification testimony, the court below carefully instructed the jury that it must be "convinced that the witness had the capacity and an adequate opportunity to observe the offender." The court further instructed that the jury must be:

> satisfied that the identification made by the witness subsequent to the offense was the product of his or her own recollection. You may take into account both the strength of the identification and the circumstances under which the identification was made. If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him or her for identification, you should scrutinize the identification with great care. You may also consider the length of time that elapsed between the occurrence of the crime and the next opportunity of the witness to see the defendant as a factor bearing on the reliability of the identification. You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.

Also at issue on this appeal is the admissibility as prior similar acts under Fed.R.

Evid. 404(b) of Williams' conviction in 1978 for conspiracy to commit a bank larceny in 1975, and of his conviction in 1972 for receipt of the proceeds of a bank robbery. Having concluded that the probative value of the prior convictions outweighed the danger of unfair prejudice to the defendant, the trial court admitted the evidence and instructed the jury that it could consider the prior convictions as evidence of the identity of the perpetrators of the attempted robbery or as relevant to the issue of intent. The trial judge also cautioned the jury that they could "not conclude from proof of a similar act that a defendant has a bad character and that, therefore, he committed the crimes charged."

## II. THE IN–COURT IDENTIFICATION

Although the Government concedes that the accidental courtroom confrontation between Sister Sweeney and Williams was "obviously suggestive," it argues that Sister Sweeney's identification of appellant was a product of her own independent recognition of him and was possessed of sufficient features of reliability to permit its evaluation by the jury. We agree.

In *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court recently set forth the factors to be considered in evaluating identification evidence obtained through unnecessarily suggestive confrontation procedures. In *Manson*, the Court specifically rejected any *per se* approach, which would mandate the exclusion of identification evidence, without regard to reliability, whenever it had been unnecessarily obtained through an impermissibly suggestive procedure.[5] Concluding that "reliability is the linchpin in determining the admissibility of identification testimony," the Court held that the Due Process Clause of the Fourteenth Amendment did not require a strict exclusionary rule, but rather was satisfied if the identification was reliable under "the totality of the circumstances." Id. at 113–14, 97 S.Ct. 2243.

---

**5.** In *Manson*, the Court reversed this Circuit's decision in *Brathwaite v. Manson*, 527 F.2d 363 (2 Cir., 1975), that the *per se* exclusionary rule applied to evidence obtained through unnecessarily suggestive confrontation procedures.

The Court stated that the criteria for determining reliability include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation and the time between the crime and the confrontation."[6] Id. at 114, 97 S.Ct. at 2253.

■ We turn now to an application of the *Manson* criteria to Sister Sweeney's identification of Williams. The record demonstrates that Sister Sweeney had sufficient opportunity to view Williams on the morning of the attempted robbery. She had parked her car directly behind the blue Buick from which Williams and his two accomplices emerged, and was thus able to observe Williams place the bottle in front of the old bank. Later, Sister Sweeney saw Williams "pass right by" her, still unmasked, as he entered the bank. The witness' degree of attention was unusually high in view of the precise details she recalled regarding the color and license plate of the Buick, the placing of the bottle by Williams, and the calm atmosphere in the bank before she entered. Further, Sister Sweeney was able to provide detailed descriptions of Williams and his companions, including height, weight and apparel. Her failure to identify Williams' face in the surveillance photos and the photographic array did not in this instance indicate prior "inaccurate" descriptions; rather it seems attributable to precision and caution on the part of the witness. Sister Sweeney identified the men depicted in the surveillance photos based only on their apparel since the facial features were obscured by stocking masks. Further, she specifically qualified her failure to identify Williams from the photo spread by noting that "the skin was too light on some of those photographs." It

appears from the record that Sister Sweeney was unusually careful in her identification of the appellant, and "was not a person readily susceptible to suggestive influences." *United States v. Famulari*, 447 F.2d 1377, 1381 (2d Cir. 1971). Her inability to identify Williams from a possibly inadequate photograph should not now detract from the accuracy and reliability of her identification. It remains that upon her first *in personam* encounter with Williams since the day of the attempted robbery, she was able to identify him, as the trial court found, "in her own mind" entirely independent of any influence. With respect to the fourth *Manson* factor, level of certainty, Sister Sweeney was 90% certain that the appellant was the man she had seen put down the bottle and then enter the bank. Finally, although the time lapse of two years and eight months between the crime and the in-court confrontation is a somewhat negative factor, it is outweighed by the other four *Manson* criteria, especially in view of Sister Sweeney's spontaneous identification of appellant. Therefore, based on the totality of the circumstances, Sister Sweeney's in-court identification of Williams was sufficiently reliable to warrant its admission into evidence.

The admissibility of Sister Sweeney's identification of Williams is fortified by this court's decision in *United States v. Famulari, supra.* In that case, we held that where the witness confronts the defendant, prior to testifying, in substantially the same circumstances in which he would have encountered him from the witness stand, his in-court identification cannot be said to have been infected by the pre-testimonial identification.[7]

■ Appellant also argues that Sister Sweeney's accidental confrontation with

---

6. These five factors were originally set out in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

7. Appellant here relies primarily on *Boyd v. Henderson*, 555 F.2d 56 (2d Cir.), cert. denied, 434 U.S. 927, 98 S.Ct. 410, 54 L.Ed.2d 286 (1977), to support his argument that Sister Sweeney's identification of Williams was impermissibly tainted by her pre-testimonial iden-

tification of the appellant. However, that case is distinguishable from *Famulari* and the instant situation. In *Boyd* the in-court identification by the witness (Mrs. Arrington) was influenced by factors other than her pre-testimonial confrontation with the defendant at a *Wade* hearing. The court in *Boyd* found most significant the additional suggestive factors that the witness knew that the defendant had been apprehended in the get-away car and further that

Williams violated his Sixth Amendment right to counsel. We disagree. Where the confrontation is not arranged by the Government, the danger of suggestive influence is considerably reduced. In the instant case, the trial court specifically found that Sister Sweeney's confrontation with appellant was accidental and that her identification was spontaneous and independent of any influence. Moreover, it is clear from the record that defense counsel was present during the confrontation and, once aware that it had occurred, was able to argue its suggestive nature to the jury. In addition, under *United States v. Famulari, supra*, appellant is unable to demonstrate any prejudice due to the accidental confrontation since Sister Sweeney identified Williams under virtually the same circumstances as she would have when she eventually confronted him from the witness stand.

## III. PRIOR SIMILAR ACTS EVIDENCE

Appellant also contests the admission under Fed.R.Evid. 404(b) as prior similar acts of Williams' conviction in 1978 for conspiracy to commit a bank larceny in 1975, and of his conviction in 1972 for receipt of the proceeds of a bank robbery. In *United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978), and *United States v. Gubelman*, 571 F.2d 1252 (2d Cir.), cert. denied, 436 U.S. 948, 98 S.Ct. 2853, 56 L.Ed.2d 790 (1978), this court established a two-fold analysis to be applied by district courts in deciding whether evidence of similar criminal acts should be admitted. First, the trial judge must determine under Rule 404(b) that the other crimes evidence is relevant to some issue at trial other than "to prove the character of a person in order to show that he acted in conformity therewith."[8]

Second, even if relevant, the judge must find that the probative value of the evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . .," as required by Fed.R.Evid. 403.[9] When both tests have been carefully satisfied, the trial court's exercise of broad discretion will not lightly be disturbed. *United States v. Williams*, 577 F.2d 188, 191 (2d Cir. 1978).

We find the questions regarding the admissibility of the other crimes evidence here on the issues of identity and intent to be close and substantial ones. We do not find it necessary or fruitful to analyze these difficult questions in detail because we believe the introduction of the other crimes evidence in the particular circumstances of this case, if error, to have been harmless beyond a reasonable doubt. A nun, the proverbial perfect witness, observed a man in broad daylight place a bottle, with a fingerprint on it conceded to be appellant's, next to the bank. She testified that the man who placed the bottle there was wearing a light colored wide-brim hat at the time. Bank surveillance photos of the robbery showed a man in the bank wearing a wide-brim light colored straw hat. The Branch Manager at the bank testified that one of the holdup men was wearing a white hat. Further, Sister Sweeney observed that one of the three men running along the side of the bank just after the shots rang out was wearing a straw hat. In short, the evidence linking the man whose fingerprint was on the bottle placed outside the bank to participation in the almost immediately subsequent robbery inside the bank was overwhelming. Since the fingerprint was conceded to be appellant's, it would have been unreasonable for a jury to have acquitted appellant.

her friend had previously identified the defendant to the police as the person who had committed the crime at issue. Id. at 62.

**8.** Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**9.** Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Nevertheless, we cannot close this opinion without expressing concern over the Government's readiness to jeopardize a conviction by use of other crimes evidence when the question of admissibility, as here, is a close one. And if the prosecution insists on offering such evidence, in a case where it is risky to do so, it must be remembered that "There is no presumption that evidence of other crimes is relevant to any issue in a criminal trial . . .." See *United States v. Benedetto, supra,* 571 F.2d at 1248. District judges must carefully scrutinize both the basis for the claimed relevance of such evidence and the balance between its probative value and prejudicial effect. The key to a fair trial in such cases is careful determination by the trial judge of both issues, particularly the latter.

We find that all further issues presented for review by appellant are meritless.

Affirmed.