UNITED STATES of America, Appellee,

v.

Joseph DiPALERMO, a/k/a "Joe Beck", Salvatore Lombardi, a/k/a "Herman", George Gillette and Alan Kassebaum, Appellants.

Nos. 962, 963, 964 and 987, Dockets 78–1408, 78–1413, 79–1032 and 79–1046.

United States Court of Appeals, Second Circuit.

Argued May 2, 1979.

Decided Aug. 21, 1979.

---

Michael Rosen, New York City (Roy M. Cohn, Saxe, Bacon & Bolan, P. C., New York City, of counsel), for appellant DiPalermo.

Roger Bennet Adler, New York City (Gustave H. Newman, New York City, of counsel), for appellant Lombardi.

Raymond B. Grunewald, New York City, for appellant Gillette.

Harvey L. Greenberg, Brooklyn, N.Y. (Frank T. Geoly, Brooklyn, N.Y., of counsel), for appellant Kassebaum.

Richard Appleby, Asst. U.S. Atty., Eastern District of New York, Brooklyn, N.Y. (Edward R. Korman, U.S. Atty., Harvey M. Stone, Asst. U.S. Atty., Vivian Shevitz, Asst. U.S. Atty., Eastern District of New York, Brooklyn, N.Y., of counsel), for the United States of America.

Before GURFEIN and MESKILL, Circuit Judges, and WYZANSKI *, District Judge.

PER CURIAM:

Joseph DiPalermo, Salvatore Lombardi, George Gillette and Alan Kassebaum appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York, Edward R. Neaher, *Judge*, after a three-week jury trial. All of the appellants were convicted of conspiring to manufacture and possess with intent to distribute methaqualone, commonly known as "quaaludes," in violation of 21 U.S.C. § 846. Kassebaum was also convicted of possession of methaqualone with intent to distribute, 21 U.S.C. § 841(a)(1). Finding no reversible error, we affirm the judgments of conviction.

Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the government showed

---

* Hon. Charles E. Wyzanski, Jr., of the United States District Court for the District of Massachusetts, sitting by designation.

that the following series of events took place. Beginning in April of 1977, one Vincent Marchese, a paid informant for the Drug Enforcement Administration, insinuated himself into a conspiracy to manufacture quaaludes. On April 15, Marchese met with appellant Gillette at Marchese's home in Staten Island. Gillette told Marchese that he had a friend named "Herman" who had manufactured quaaludes in the past but who needed a new supply of chemicals in order to stay in the business. "Herman" was apparently able to come up with the money, but had thus far been unable to come up with a connection leading to the necessary supplies—approximately 490 pounds of various chemicals. Marchese agreed to locate the needed source and immediately called the DEA, which in turn contacted the Berg Chemical Company. Marchese then informed Gillette that he had been successful in his search, and that the price of the chemicals would be $10,000 —a price to which "Herman" agreed. Marchese and Gillette picked up the chemicals on June 23, 1977, and took them to a previously secured warehouse in New Jersey. The chemicals having been purchased, the next step was to create a manufacturing laboratory—a task to which "Herman" was assigned.

Much to Marchese's and Gillette's consternation, however, "Herman," who by this time had been identified by the DEA as appellant Lombardi, was unable to locate the needed facility. Almost four months elapsed before the laboratory began to take shape. In the middle of September, Ryland Luttrell, caretaker and watchman at 135 Ellis Street in Staten Island, was visited by three men, one of whom Luttrell subsequently identified as appellant DiPalermo. The visitors took a look around the premises—no doubt taking note of the fact that 135 Ellis Street is in a remote area of Staten Island, that the property occupies about 13 acres of land, and that situated thereon was a rather run-down old house, as well as a dock. Luttrell observed DiPalermo get out of the car, but he was approached only by DiPalermo's two companions. These two men asked Luttrell certain questions about the condition of the dock and the depth of the water, reported back to DiPalermo, returned to ask a few more questions, again returned to the car and drove off.

Approximately a month later, Gillette was observed by the DEA at the Ellis Street location. When he left the premises, DEA agents followed him into lower Manhattan, observed him make a series of telephone calls from a public booth and, fifteen minutes after making the calls, being joined by DiPalermo. One of the agents strolled by Gillette and DiPalermo and overheard the following conversation:

DiPalermo: It is a lot of money.

Gillette: I know it is a lot of money. That's why you've got to straighten it out.

After about fifteen minutes, DiPalermo left. A week later, Gillette was again observed at the Ellis Street site. Upon leaving, he was again followed to the same street corner in lower Manhattan where he again met with DiPalermo. Again a DEA agent walked by them, this time overhearing DiPalermo saying to Gillette: "This is what you do."

Five days later, on October 31, the chemicals were moved from the New Jersey warehouse to 135 Ellis Street, the entire day's activities being monitored by the DEA. Gillette and Marchese began the day by removing the chemicals from the New Jersey warehouse and depositing them into a Ryder rental truck. Gillette then drove the truck to Lombardi's Staten Island address, with Marchese following in Gillette's car. Gillette explained to Marchese that the truck was being left there so that "Herman" could keep an eye on it. Shortly after that, DEA agents observed Lombardi driving the truck on a route leading directly to 135 Ellis Street. At a certain point in its travels, however, the truck began to vary its speeds considerably and take what are commonly referred to as "evasive maneuvers." Eventually, the truck worked its way back to Lombardi's residence. Later that night the truck was observed at 135 Ellis Street, where the chemicals were un-

loaded and taken into the house. Gillette later explained to Marchese that "Herman" had successfully delivered the chemicals to the soon to be operating laboratory. Gillette also explained to Marchese that the DEA surveillance had been picked up during the attempted delivery of the chemicals, that he was troubled by this development, and that he would have to talk to his "friend in New York" about the situation. His "friend in New York" turned out to be named "Joe Beck," which is apparently a name used on occasion by appellant DiPalermo.

Because none of the participants in the scheme had sufficient knowledge of chemistry to go about manufacturing marketable quaaludes, they next set about the task of recruiting someone who did. Appellant Kassebaum, a licensed New York pharmacist, apparently fit the bill. Both Luttrell and various DEA agents observed Kassebaum at the 135 Ellis Street site on a number of occasions. Upon leaving Ellis Street on one such occasion, he was followed by DEA agents who subsequently overheard him state over a telephone: "I finally got something good and nice for you. It turned color." [1] DEA agents subsequently observed Kassebaum purchasing paraphernalia that was eventually seized at the laboratory.

On November 14 the DEA closed in, arresting Kassebaum a short distance from the Ellis Street laboratory and escorting him back to the premises so they could execute a search warrant. Kassebaum broke free, however, ran into the house and closed the door behind him. The agents, locked out of the house, determined that Kassebaum had fled to the bathroom and had begun flushing evidence down the toilet. They forced their way in and found Kassebaum shielding himself behind his German Shepherd. The agents prevailed, however, took Kassebaum into custody, and proceeded to search the laboratory. In the first floor bathroom they discovered a brown powder which turned out to be methaqualone; during their search of the rest of the house they seized more methaqualone, various pieces of laboratory equipment, and the chemicals that had been purchased by Marchese and Gillette from the Berg Chemical Company.

In our judgment, only two of the issues raised by the appellants warrant discussion, those issues focusing on Luttrell's in-court identification of DiPalermo and the nature and sufficiency of the evidence to support the conviction of Lombardi.

After all of the defendants had been arrested, the DEA interviewed Luttrell regarding his recollection of the happenings at 135 Ellis Street. He described an individual who fit the description of Gillette and, when shown a photograph of Gillette, identified him as one of the men to whom he had spoken about renting the Ellis Street facility. At that point, the DEA put together a spread of photographs, including photographs of DiPalermo, and asked Luttrell if he recognized any of the subjects. Luttrell picked out DiPalermo as someone who had been at the Ellis Street site, and he related the details of DiPalermo's visit. Luttrell subsequently identified DiPalermo during the trial as one of the individuals he had seen at the Ellis Street location.

This Court has recently explained the law as it relates to in-court identifications that have been preceded by pre-trial photographic identifications in the following fashion:

A conviction "based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." . . . "[R]eliability is the linchpin in determining the admissibility of identification testimony," . . . and the court must look to the "totality of the circumstanc-

---

1. A DEA chemist testified at trial that color is an indication of the degree of purity of methaqualone.

es" to determine whether the in-court identification is reliable even if the pretrial identification procedure was suggestive.

*United States v. Sanchez*, 603 F.2d 381, 384 (2d Cir. 1979), *quoting Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *and Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *See generally United States v. Williams*, 596 F.2d 44, 48–49 (2d Cir. 1979); *Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir. 1978); *United States v. Moskowitz*, 581 F.2d 14, 19–20 (2d Cir.), *cert. denied*, 439 U.S. 871, 99 S.Ct. 204, 58 L.Ed.2d 184 (1978). Included in the "totality of the circumstances" are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers, supra*, 409 U.S. at 199–200, 93 S.Ct. at 382.

Although DiPalermo's counsel has pointed to certain weaknesses in the government's procedures and in Luttrell's identification, it is our judgment that, with a view toward the "totality of the circumstances," the identification passes muster. Although the photographic identification procedure is subject to criticism because there were more photographs of DiPalermo than of any of the others and because DiPalermo's photograph had a DEA label, it is nevertheless our conclusion that this did not "give rise to a very substantial likelihood of irreparable misidentification." In addition, it is our conclusion that Luttrell's identification of DiPalermo in the courtroom was a "reliable" one. Luttrell, after all, was responsible for scrutinizing visitors to the Ellis Street location, and he had a good deal of time during which to view DiPalermo, some of which was spent at relatively close range.

As to appellant Lombardi, it is our judgment that there was sufficient non-hearsay evidence to justify the admission of statements made by his fellow conspirators and that, with this evidence properly admitted, there was sufficient evidence to support his conviction. On this issue as well, this Court has on recent occasion set out the governing law. In *United States v. Lyles*, 593 F.2d 182 (2d Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979), we said:

> When in a criminal case the government seeks, under the co-conspirator rationale, to introduce as an admission the out-of-court statement of a declarant other than the defendant, the trial judge must make a preliminary determination that there is sufficient independent evidence to establish the following: (1) that a conspiracy existed . . . ; (2) that the conspiracy was still in existence at the time the statement was made . . . ; (3) that the declarations were made in furtherance of the conspiracy . . . ; and (4) that both the declarant and the defendant participated in the conspiracy . . . . While the practicalities of proof may require that a particular statement be admitted subject to connection, that is, subject to an adequate showing of the elements just summarized, "if at the close of the Government's case the connection has not been proved, the court must, upon motion, strike the insufficiently connected item and direct the jury to disregard it."

593 F.2d at 194 (citations and footnote omitted). And in *United States v. DeFillipo*, 590 F.2d 1228 (2d Cir. 1979), the Court reaffirmed the principle that participation by the defendant in the alleged conspiracy must be "established 'by a fair preponderance of the evidence independent of the hearsay utterances.'" 590 F.2d at 1236, *quoting United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). *See also United States v. Ziegler*, 583 F.2d 77, 81 n. 6 (2d Cir. 1978); *United States v. Stanchich*, 550 F.2d 1294, 1297–99 & n. 4 (2d Cir. 1977); *United States v. Glazer*, 532 F.2d 224, 228–29 (2d Cir.), *cert.*

*denied,* 429 U.S. 844, 97 S.Ct. 123, 50 L.Ed.2d 115 (1976); *United States v. Wiley,* 519 F.2d 1348, 1350–51 (2d Cir. 1975), *cert. denied,* 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976). *Compare United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

Although we believe the case to be close in this regard, it is our conclusion that this requirement was met. Lombardi's repeated associations with the other members of the conspiracy, especially his involvement with the rental truck that carried the needed chemicals to the Ellis Street laboratory, provided strong ground for the conclusion that Lombardi was involved in an unlawful conspiracy. Although each of the bits of evidence produced by the government to support the conclusion that Lombardi was a co-conspirator would by itself be equally consistent with innocence, such pieces of evidence are to be viewed "not in isolation but in conjunction." *United States v. Geaney, supra,* 417 F.2d at 1121. *See also United States v. Monica,* 295 F.2d 400, 401 (2d Cir. 1961), *cert. denied,* 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962) ("each of the . . . episodes gained color from each of the others"). As explained by Judge Friendly in *United States v. Stanchich, supra,* "[j]udges are not required to exhibit a naiveté from which ordinary citizens are free." 550 F.2d at 1300. In this light, the *Geaney* test was met, and in that light, there was sufficient evidence to support Lombardi's conviction.

 The other claims put forth by the appellants must also be rejected. Our review of the record satisfies us that there was sufficient evidence to support each of the convictions. Although the comments during summation by the Assistant United States Attorney in charge of the trial do not merit our approval, neither do they warrant reversal in this case. We do caution the government, however, that "[i]n conspiracy cases, where the liberal rules of evidence and the wide latitude accorded the prosecution may, and sometimes do, operate unfairly against an individual defendant,"

*Glasser v. United States, supra,* 315 U.S. at 76, 62 S.Ct. at 467–468, the content and tone of the summation should be kept closely in check. There is no merit to the claim by Gillette that his conviction should be reversed because he conferred with DEA agents without the presence of his counsel. The record shows that Gillette initiated the contact and that he was in no way prejudiced by its having occurred. *See Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). DiPalermo's sentencing hearing was conducted in accord with the governing law of this Circuit. *See United States v. Fatico,* 603 F.2d 1053 (2d Cir. 1979); *United States v. Fatico,* 579 F.2d 707 (2d Cir. 1978). The remaining claims do not merit discussion.

The judgments of conviction are affirmed.