**UNITED STATES of America**

v.

**Jyi McCRAY.**

**No. 1:96–CR–54(3).**

United States District Court,
E.D. Texas,
Beaumont Division.

Oct. 22, 1996.

John Stevens, Assistant U.S. Attorney, Keith Giblin, Assistant U.S. Attorney, Beaumont, TX, for plaintiff.

Thomas Allen Chambers, Liberty, TX, for Jyi R. McCray.

## FINDINGS AND ORDER

HEARTFIELD, District Judge.

On September 25, 1996 a hearing was held on Defendant, Jyi McCray's, Motion to Suppress Photo Identification and in Court Identification and Request for Hearing. The Court now enters its findings of fact and conclusions of law.

### Factual Background

On March 14, 1994, the Subway Sandwich Shop, located at 1050 East Virginia St. in Beaumont, Texas, was robbed by two armed men. The first of these men was armed with a pistol, and the second with a shotgun. Subsequently, Jyi McCray, the Defendant in this case, was identified in a photo lineup as the man with the shotgun.

During the course of the robbery, the assistant manager, Charles Mitchell, was present and observed the perpetrators. From the vantage point of the front counter, Mitchell observed the two men attempt to sneak into he store by crouching down. He informed them that he had spotted them, and told them to stand up. The men then stood up and approached the counter. The men had attempted to conceal their faces by wearing their respective t-shirts pulled over their mouth to a point below their nose. The men's head, ears and face from the nose up were plainly visible. The man with the pistol came around the counter with the intention of robbing the safe, but decided against it after the man with the shotgun said they didn't have enough time. The man with the shotgun instructed Mitchell to remove the cash from the cash register. After gathering the money from the register they left the Subway restaurant.

On May 15 of 1996, pursuant to the investigation of the Subway robbery, Mitchell came to the Violent Crimes Task Force office in Beaumont, Texas, at the request of FBI agent Ed Keller. At that time Mitchell was taken to a room where six color, eight by ten photographs of black males were pinned to the wall. The evidence reveals no irregularities either in the photographs themselves, or in their placement. Agent Keller asked Mitchell if he recognized any of the photographs. After examining each of the photographs in the row, Mitchell identified the second photograph, that of Jyi McCray, as being a photograph of the man with the shotgun at the Subway restaurant robbery.

### Discussion

 McCray seeks to suppress an in-court identification by Mitchell on the grounds that the photo lineup, by means of which he was identified to the police, was impermissibly suggestive. The Fifth Amendment affords protections against the admission of evidence derived from unreliable identifications which are based upon impermissibly suggestive photographic lineups. *United States v. Sanchez*, 988 F.2d 1384, 1389 (5th Cir.1993). The admissibility of the photo identification and the evidence deriving from it are dependant upon a two part test. *Sanchez*, 988 F.2d at 1389.

> First, the courts must determine whether the photographic display was impermissibly suggestive. If it was, the court must proceed to the second inquiry and determine whether the display posed a "very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The gravamen of this determination is fairness and reliability.

*Id.*

 McCray contends that the photo lineup was impermissibly suggestive because Mitchell was asked by agent Keller to identify the second person who robbed him, the man Mitchell had referred to in his statement dated May 4, 1994, as the "second black male" and "the second subject." Defs.' Ex. # 1. As it happens, McCray's photo was the

second photo in the array.[1] There was no other ascertainable defect in the arrangement of the photos, and there was no actual suggestive conduct or communication on the part of Agent Keller during the time that Mitchell was examining the picture. Further, Mitchell testified that the order of the photos did not influence his decision in any manner. Nonetheless, McCray contends that the placement of the photo in light of the designation of the man with the shotgun as the second suspect caused the lineup to be impermissibly suggestive. The Court finds that, in light of the lack of suggestive words or conduct on the part of Agent Keller, the mere placement of the photo alone is simply too thin a reed upon which to rest a finding of impermissible suggestiveness.

■ However, McCray raises a second contention, arguing that all six men depicted in the photo lineup were suspects in this case and that this had a corrupting effect on the lineup.[2] This raises the concern that no matter who Mitchell selected—if indeed he selected anyone at all—that selection would, in effect, be the "right choice." There is no possibility for a false positive result. This is an issue of concern for the Court in that it is analogous to a one man lineup or "showup",

for, under these circumstances, whether there are six men in the array or one, there can be no wrong selection.[3] As to photo showup with only one picture, their status in this circuit is clear: "exhibiting a single photo for identification purpose is impermissibly suggestive." *Sanchez*, 988 F.2d at 1389; *Manson v. Brathwaite*, 432 U.S. 98, 108–09, 97 S.Ct. 2243, 2249–50, 53 L.Ed.2d 140 (1977).

Despite these concerns, the prevailing view appears to be an acceptance of this practice of including several suspects in the same lineup. *See e.g. United States ex rel. Pella v. Reid*, 527 F.2d 380 (2d Cir.1975) (holding that, where police were seeking the identification of three burglars, the fact that a second suspect in the crime was placed in the same lineup as defendant did not make the procedure impermissibly suggestive); *United States v. Snead*, 447 F.Supp. 1321 (E.D.Penn.1978) (holding that placing four suspect photographs in a group with ten other photographs of individuals similar in age and appearance to the four suspects was not proscribed as impermissibly suggestive).

However, the practice has not been accepted without hesitation, particularly where all credible candidates in a lineup are suspects:

1. There was no visible number or letter designations on or near the photos at the time of the identification.

2. In fact, four of the men depicted in the photographs are indicted co-conspirators who are being prosecuted in this case for a series of robberies. If the facts were such that the other photographs were of suspects in the conspiracy case, *but not suspects in the Subway robbery in particular*, then obviously the Court's concerns with the lineup procedure would be significantly diminished. However, the evidence suggests otherwise, and the Government offered no proof to the contrary either in the suppression hearing, or in a subsequent brief filed by the government. That brief addresses the issue that all the men in the lineup were suspects. It was filed in response to the Court's request for further briefing concerning the issues involved in the McCray out-of-court identification in which the Court specifically mentioned this issue.

3. In fact, it is possible that a lineup containing only suspects in the crime being investigated is more suggestive than a showup in terms of erroneous positive identifications. One recent study concluded that "[i]n both the laboratory and the field, witnesses are far more likely to pick out a

member of the lineup than they are to identify a lone suspect." Richard Gonzalez, Phoebe C. Ellsworth, & Maceo Pembroke, *Response Biases in Lineups and Showups*, 64 *Journal of Personality and Social Psychology* 525, 536 (1993). The authors hypothesize that this phenomenon is due to two factors. First, witnesses may employ different cognitive problem solving strategies the two situations. They suggest that lineups are approached as an attempt to pick out the best match to the witness' memory of the perpetrator, while showups are approached in terms of an absolute judgement of whether the suspect being shown is the right person or not. *Id.* Second, it may also be the case that "police pressures to make an identification ... may be greater in a lineup than in a showup." *Id.* The authors continue: "It is often argued that most mistaken identifications in lineups are harmless because they are identifications of foils known to be innocent; thus, lineups provide protection against overeager but unreliable witnesses that showups do not afford." *Id.* The authors raise concerns about this claim, but in this case the concern is obvious and direct: there were no "foils" in the lineup. This raises grave concerns about suggestiveness and the potential for false positive identifications in a lineup which contained only suspects in the crime being investigated.

When a defendant appears in a lineup with other suspects in the same crime, this fact has been held not to be so unfair as to require the exclusion of defendant's identification. But, truthfully we must admit that it is not the best practice, and together with other circumstances may lead a court to understand that a violation of due process may be inherent in a contested lineup.

*United States v. Rodriguez,* 363 F.Supp. 499 (D.P.1973). In *Rodriguez,* suspects were gathered for identification shortly after the eruption of a courtroom "melee" during which several assaults occurred. *Id.* at 499–500. The only other participants in the lineup were law enforcement officers who were likely to be recognized by the victims of the assaults as such since those victims were, themselves, other law enforcement officers. *Id.* at 500. "For all practical purposes, therefore, the only persons involved in the lineup to be identified were the suspects arrested during the general commotion." *Id.*

Despite the court's own words of caution, it nonetheless went on to find that the lineup had been neither unnecessarily suggestive nor conducive to irreparable misidentification. In large part, the court rested its holding upon two facts. First, it found that there was no evidence of suggestiveness with respect to any particular defendant. Second, it found that the "compelling and extraordinary circumstances" surrounding the courtroom "melee" created "[t]he need for fast action on the part of the Government" to utilize a lineup procedure that had "fallen short of the ideal." *Id.* at 502. The Court notes that in this case there were no similar exigent circumstances at work. At the same time, however, other situational factors may have borne upon the investigation. The Court recognizes that "[p]olice stations are not theatrical casting offices", and reasonable, though imperfect, efforts are all that can be expected. *Swicegood v. Alabama,* 577 F.2d 1322, 1327 (5th Cir.1978).

In another such case where the lineup contained only suspects the court appears to have rested its analysis on the second factor in the test of admissibility, finding such an identification reliable, even if improperly sug-

gestive. *McNeary v. Stone,* 482 F.2d 804 (9th Cir.1973), *cert. denied,* 414 U.S. 1071, 94 S.Ct. 584, 38 L.Ed.2d 478 (1973). In that case the police sought the identification of three robbers. *Id.* at 805–06. The court held that a photographic lineup "where only pictures of the three suspects were presented was improper, but that alone is not sufficient for a determination that the procedures taken in toto were so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification." *Id.* at 806.

Given the evident concerns about the lineup procedure used in this case, the Court will address the second element of the test for admissibility of the photo lineup, without resting upon a finding that the lineup was not impermissibly suggestive. In order to determine whether a photo lineup could give rise to a substantial likelihood of irreparable misidentification:

> This Circuit relies on six factors to determine the reliability of pretrial identification: (1) the opportunity of the witness to view the suspect, (2) the witnesses' degree of attention, (3) the accuracy of the pre-identification description, (4) the witnesses level of certainty, (5) the time that had elapsed between the crime and the identification, and (6) the corrupting influence of the suggestive identification itself.

*United States v. Merkt,* 794 F.2d 950, 958 (5th Cir.1986). Each of these factors will be examined in order. However, the fact that some, or even all, of these factors weigh against the reliability of the identification is not conclusive. *Id.* Rather, the Court must look at the totality of circumstances to determine whether the photo lineup gives rise to a substantial likelihood of irreparable misidentification. *United States v. Shaw,* 894 F.2d 689, 692 (5th Cir.1990).

**1. Opportunity to view the suspect.** Although the face of the man with the shotgun was partially covered by a shirt pulled up under his nose, the upper portion of his face, including his nose, eyes, head, ears and hair were visible. Mitchell was able to get a clear view of the man with the shotgun as he approached the counter. Mitchell also observed the man with the shotgun as he emptied the cash register and then he watched the man gather the money up. The man

with the shotgun stood within arm's reach of Mitchell for a minute to a minute and a half during the course of the robbery. The scene was well lit, and Mitchell suffers from no visual problems.

**2. Degree of attention.** Mitchell's attention was well focused on the men who were robbing the store. At the suppression hearing, Mitchell stated, "You just don't forget a person that's pointed a gun at you." Suppress.Tr., at 504.

**3. The accuracy of the pre-identification description.** There is some cause for concern regarding the accuracy of Mitchell's pre-identification description. At the suppression hearing, it appeared that McCray was several inches shorter and had a lighter skin color than the man with the shotgun as Mitchell described him in his statement dated May 4, 1994. As to the concern over the height of the two men, this discrepancy is mitigated by several factors. First, the men who robbed the Subway restaurant first entered in a crouching position, potentially confusing Mitchell's estimates of the comparative height of the two robbers. Secondly, by pulling their shirts up over their mouths and lower face to conceal their appearance, the robbers may also have obscured their true height. Wearing a shirt pulled up from the shoulders could conceal the neck, shoulders, and lower face in such a way as to distort the appearance of their height. In addition, Mitchell focused his attention primarily on the face of the two men. On the whole, then, the Court finds that the pre-identification description by Mitchell, while a cause for concern, is not so clearly inaccurate as to render the photo identification procedure itself wholly unreliable.

**4. The witness' level of certainty.** Mitchell answered affirmatively to the government's inquiry as to whether he would have recognized the men who robbed him walking down the street before he had seen the lineup. At the photo lineup Mitchell carefully surveyed the photos and then selected the photo of McCray without hesitation, and was "very sure" that he had identified the right man. Suppress.Tr. at 540.

**5. The time between the crime and the confrontation.** Two years and two months passed between the occurrence of the robbery and the photo lineup identification of McCray. While this delay in identification is hardly ideal, it is certainly not unprecedented, and does not of itself disqualify identification testimony. *E.g. United States v. Larkin,* 978 F.2d 964 (7th Cir.1992) (upholding the admission of identification testimony in a robbery case where lineups for the two robbers occurred after a period of ten months and two years and two months, respectively, from the time of the robbery); *United States v. Williams,* 596 F.2d 44 (2nd Cir.1979) (upholding admission of identification testimony in a robbery case based upon the other reliability factors where the time between the crime and the identification was two years and eight months).

**6. The corrupting influence of the suggestive identification.** As was discussed above, the primary concern regarding the potentially corruptive effects of the photo identification raised by McCray involves the fact that all the individuals pictured in the photo array were suspects in this case. However, given the impeccable physical arrangement of the lineup itself, the fact that photos displayed were large and of high quality, the lack of any suggestive words or conduct on the part of Agent Keller during the identification, the care which Mitchell took in making his identification, and the certainty and confidence with which he made the identification, the Court finds that the reliability of the identification was not overborne by the potentially corruptive effects of the procedure employed.

### Conclusion

Taking into account the totality of these circumstances, the Court finds that the photo identification does not create a substantial risk of irreparable misidentification, and therefore DENIES Jyi McCray's Motion to Suppress Photo Identification and In Court Identification with respect to both the photo identification made by Charles Mitchell on May 15, 1996, and any in-court identification by Charles Mitchell.