for resentencing in accordance with L.B. 44, as codified at § 28-105.02.

Upon our review of the record, we find plain error in the district court's sentencing order, which ordered that the three sentences for the convictions of use of a deadly weapon to commit a felony, counts II, IV, and VII, run concurrently with any other sentence. We also find plain error in the district court's sentencing order, which ordered that the sentences for the convictions of count V, attempted second degree murder; count VI, attempted robbery; and count VIII, criminal conspiracy, run concurrently with the sentences for use of a deadly weapon. We therefore vacate the sentences for counts II, IV, V, VI, VII, and VIII, and remand the cause to the district court with directions to resentence Ramirez on all these counts, so that each sentence for the conviction of use of a deadly weapon runs consecutively to all other sentences and concurrently with no sentence.

CONVICTIONS AFFIRMED, ALL SENTENCES VACATED,
AND CAUSE REMANDED FOR RESENTENCING.

---

STATE OF NEBRASKA, APPELLEE, V.
TREVELLE J. TAYLOR, APPELLANT.
___ N.W.2d ___

Filed February 14, 2014.    No. S-12-434.

1. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court will review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds.

2. **Identification Procedures: Due Process: Appeal and Error.** A district court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error.

3. **Constitutional Law: Statutes: Judgments: Appeal and Error.** The constitutionality and construction of a statute are questions of law, regarding which the Nebraska Supreme Court is obligated to reach conclusions independent of those reached by the court below.

4. **Trial: Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether

in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

5. **Trial: Evidence: Appeal and Error.** Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

6. **Criminal Law: Identification Procedures: Witnesses: Words and Phrases.** A showup is usually defined as a one-on-one confrontation where the witness views only the suspect, and it is commonly conducted at the scene of the crime, shortly after the arrest or detention of a suspect and while the incident is still fresh in the witness' mind.

7. **Constitutional Law: Identification Procedures: Due Process.** An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law.

8. **Identification Procedures.** Reliability is the linchpin in determining the admissibility of identification testimony.

9. **Criminal Law: Statutes: Legislature: Sentences.** Where a criminal statute is amended by mitigating the punishment, after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature has specifically provided otherwise.

Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Affirmed in part, sentence vacated in part, and cause remanded for resentencing.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

HEAVICAN, C.J., WRIGHT, STEPHAN, MILLER-LERMAN, and CASSEL, JJ.

WRIGHT, J.

## I. NATURE OF CASE

A jury convicted Trevelle J. Taylor of first degree murder and use of a deadly weapon to commit a felony. He was sentenced to life imprisonment and a consecutive sentence of 10 years' to 10 years' imprisonment, respectively. His convictions arose from his participation, at the age of 17 years, in the death of Justin Gaines. In this direct appeal, Taylor alleges several trial errors and claims his sentence of life imprisonment was

unconstitutional under *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). We affirm his convictions but remand the cause for resentencing on the conviction of first degree murder.

## II. SCOPE OF REVIEW

[1] Apart from rulings under the residual hearsay exception, we will review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds. *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012).

[2] "[A] district court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error." *State v. Nolan*, 283 Neb. 50, 61, 807 N.W.2d 520, 533 (2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 158, 184 L. Ed. 2d 78.

[3] The constitutionality and construction of a statute are questions of law, regarding which we are obligated to reach conclusions independent of those reached by the court below. *Scott, supra*.

## III. FACTS

On September 19, 2009, Catrice Bryson was standing outside a friend's house on Curtis Avenue in Omaha, Nebraska, when Gaines pulled into the driveway. Bryson and Gaines spoke for about 10 minutes, during which time Gaines remained seated in his vehicle. At one point during the conversation, Bryson went to her vehicle and reached into the middle console for a pen. When Bryson turned around to rejoin Gaines, she looked toward Curtis Avenue, saw two men with guns, and heard gunshots.

The two men were in the street behind Gaines' vehicle, one on the driver's side and one on the passenger side. The shooter on the driver's side was an African American with a "[l]ow haircut" and wore a brown shirt with orange writing on it. The shooter on the passenger side was a "light-skinned"

African American with long braids, a white basketball jersey, and a "do-rag."

Bryson heard Gaines say that he had been shot. She ran toward Gaines' vehicle, screaming for the shooters to stop and to leave Gaines alone. The shooter on the driver's side ran east along Curtis Avenue, and the shooter on the passenger side ran west. Gaines subsequently died from the injuries sustained in the shooting. An autopsy revealed that death was caused by a gunshot wound to the back.

After Omaha police officers arrived on the scene, they broadcast a description of one shooter as an African-American male with long braids, a white shirt, and jean shorts. Police also broadcast a description of a "possible suspect" white vehicle that did not have hubcaps.

As Officer Joel Strominger headed toward the location of the shooting, he saw a vehicle that matched the description of the white vehicle. Near the passenger side, he observed an African-American male who was wearing a white T-shirt and dark-colored shorts and had something brown in his hand. Strominger radioed a description of the person to other officers. At trial, Strominger identified Taylor as the person he had seen near the white vehicle.

When the white vehicle went west, and Taylor went east, Strominger followed the vehicle. Once he learned that the vehicle was reported stolen, he pulled it over on 42d Street near Curtis Avenue. Strominger held the lone occupant, Joshua Kercheval, at gunpoint until additional officers arrived to assist with an arrest.

Officer Jarvis Duncan and another officer responded to Strominger's description of the person seen near the white vehicle, and while traveling in the direction Strominger indicated the individual had gone, they saw an African-American male matching the description. As they stopped, the man, later identified as Taylor, started running. The officers caught him at Kercheval's house and placed him in handcuffs. Before he was apprehended, Taylor threw a brown shirt under a tree in the front yard of Kercheval's house. At trial, Bryson identified the shirt as the shirt worn by the shooter on the driver's side of Gaines' vehicle.

Duncan placed Taylor in the back seat of a police cruiser and took him to Strominger, who was five or six blocks away. Strominger immediately identified Taylor as the person he had seen by the white vehicle. No more than 10 minutes had elapsed since Strominger had seen Taylor next to the vehicle. Taylor was subsequently charged with first degree murder and use of a deadly weapon to commit a felony. Taylor's first trial resulted in a reversal on appeal to this court for the giving of an erroneous jury instruction. The cause was remanded for retrial. See *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011).

At Taylor's second trial, the State called several witnesses who, on the day of the shooting, had observed Taylor or an individual matching his description near Curtis Avenue. Alisha Hobson and Frances Fortenberry testified that right after they heard gunshots, they saw a man matching Taylor's description running along Curtis Avenue. Trisha Lade saw Taylor running along Vernon Avenue, which is near Curtis Avenue. She saw Taylor kneel behind some bushes and heard him yell into his cell phone, "[C]ome get me." Joseph Copeland testified that just after he heard gunfire, he saw an African-American male running along Redick Avenue, which is near Curtis Avenue.

The State also adduced evidence that more than 2 months after the shooting, Copeland's son found a gun hidden in the bushes or trees of a nearby school. The weapon was a semi-automatic 9-mm pistol. Three bullet casings recovered from the scene of the shooting were matched to the pistol.

Kercheval testified that on the day of the shooting, Taylor and Joshua Nolan came to his house; asked if he wanted to ride around in their vehicle, which was white; and then requested that he drive. The three drove around in the vehicle for about 1 hour before stopping at a convenience store from approximately 1:21 to 1:34 p.m. After they left the convenience store, Kercheval let Taylor out of the vehicle at 44th Street and Curtis Avenue so that Taylor could obtain some marijuana and Kercheval parked the vehicle on 45th Street. About 5 minutes later, Nolan exited the vehicle and headed down 45th Street toward Curtis Avenue.

Kercheval testified that about 2 minutes after Nolan left the vehicle, Kercheval heard approximately 10 gunshots and saw Nolan running toward the vehicle from the direction of Curtis Avenue. Kercheval explained that Nolan got into the vehicle, asked Kercheval to "drive off," and then got out of the vehicle at a school near 40th Street and Bauman Avenue. Shortly thereafter, Kercheval was pulled over by a police officer and arrested for driving a stolen vehicle.

The jury convicted Taylor of both charges. The district court sentenced him to life imprisonment for first degree murder and 10 years' to 10 years' imprisonment for use of a deadly weapon to commit a felony, to be served consecutively to the life sentence.

Taylor timely appeals. This court is required to hear appeals in cases in which a sentence of death or life imprisonment is imposed. See Neb. Rev. Stat. § 24-1106(1) (Reissue 2008).

## IV. ASSIGNMENTS OF ERROR

Taylor assigns, consolidated and restated, that the district court erred in (1) allowing the State to present inadmissible hearsay regarding the location of the gun and (2) allowing Strominger to identify Taylor in court. Taylor also assigns that his sentence of life imprisonment was unconstitutional.

## V. ANALYSIS

### 1. Testimony Regarding Location of 9-mm Pistol

#### (a) Hearsay

At trial, Copeland testified about the location of the gun found by his son a few months after the shooting. Copeland testified:

> [Prosecution:] Drawing your attention to November 27 of 2009, did you have the occasion to call police officers out to your residence at about 12:30 that afternoon?
>
> [Copeland:] Yes.
>
> Q. And could you tell us what you called officers out for?
>
> A. My son and a neighbor boy were playing down at the school flying an airplane, and in the process they'd

lost the airplane in the trees. And while looking for it, they found a gun in the trees, bushes.

Q. And did your son tell you about this gun or did he show you where the gun was?

A. He brought the gun to me.

Q. And did your son show you where he recovered the gun from?

A. Yes.

Q. And with regards to Exhibit 201, can you show us where your son told you — showed you he recovered the gun from?

[Defense counsel]: I'm going to object. It's hearsay.

[Prosecution]: I can restate.

THE COURT: Sustained.

Q. (By [prosecution]) Did your son physically take you to the location?

A. Yes.

Q. And so you physically went to that location?

A. Yes.

Q. And can you show us on Exhibit 201 what location you went to?

[Defense counsel]: Same thing, it's hearsay. [He is] trying to testify as to where the gun was located based on the testimony of someone who didn't locate the gun. So it's hearsay. The only way he knows where it was is hearsay, is what I'm saying, from the statement from the son.

THE COURT: Overruled. You may answer.

[Copeland]: On the corner of 40th and Mary. Right as you come around that corner, that house there, there's some bushes right there. Just right off the street. About six foot [sic] off the street.

Taylor alleges that Copeland's testimony where his son found the gun was inadmissible hearsay. The State concedes that Copeland's testimony regarding the exact location of the gun was inadmissible hearsay.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Evid. R. 801(3),

Neb. Rev. Stat. § 27-801(3) (Reissue 2008). Under Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 2008), hearsay is not admissible unless a specific exception to the hearsay rule applies. The State does not argue that Copeland's statement fell within any of these exceptions.

Copeland's statement concerning the exact location of the gun should not have been admitted, because it was hearsay. His testimony that the gun was found at the corner of 40th and Mary Streets was based solely on the out-of-court statement of his son. Copeland did not personally find the gun. Copeland knew the precise location in which the gun was found only because his son communicated that information to Copeland.

### (b) Harmless Error

The State maintains that admission of Copeland's testimony that the gun was found at the corner of 40th and Mary Streets was harmless error. Taylor claims the location of the gun was an essential part of the State's theory of the case and, therefore, its admission was not harmless error.

[4] Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Kitt*, 284 Neb. 611, 823 N.W.2d 175 (2012).

[5] We conclude that the admission of Copeland's testimony concerning the precise location of the gun was harmless error. The evidence was cumulative, and there was a substantial amount of other evidence that established Taylor's guilt. Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

Taylor objected when Copeland was asked to identify the exact location where the gun was found. When the objection was overruled, Copeland stated that the gun was found

in the bushes at 40th and Mary Streets about 6 feet from the street. But Copeland had already testified without objection that his son and a neighbor found the gun while looking for their lost airplane in the trees at the school. He also testified without objection that on the day of the shooting, there was a lot of traffic around the school, indicating that the school was close to his home. Thus, evidence admitted without objection showed the gun was found near Copeland's home.

Taylor claims the admission of the hearsay was not harmless and urges this court to consider the State's closing argument, because it made several references to the 9-mm pistol. The State's closing argument referred to "the gun that [Taylor] ditched later on as he ran away from the murder." It also referred to the exact location of the gun. However, the fact that the gun was located precisely at 40th and Mary Streets was not vital to the State's case. The important fact was that the gun was found near Copeland's home, in the area where Copeland had seen someone running the day of the shooting. Evidence of that fact was admitted without objection.

Because evidence of the general location of the gun was received without objection, the subsequent hearsay was cumulative. Additionally, there was a substantial amount of other evidence that established Taylor's guilt.

Hobson, Fortenberry, and Lade testified that they saw someone matching Taylor's description in the area at the time of the shooting. Lade identified Taylor at trial. She also testified that on the day of the shooting, Taylor walked immediately in front of her as she pulled into her driveway. She heard him talking on his cell phone saying, "[W]here you at? Where you at? Come get me. I'm on 42nd." She testified that he then hid behind some bushes and that she heard Taylor say, "[C]ome get me" into his cell phone. Cell phone records indicated multiple calls between Taylor's telephone number and Nolan's telephone number around the time of the shooting. Convenience store surveillance video footage also placed Taylor with Nolan and Kercheval before the shooting occurred.

Taylor was apprehended shortly after the shooting, just several blocks away. At that time, Strominger identified Taylor

as the individual he saw near the white vehicle Kercheval was driving, which vehicle fit the description of the vehicle suspected to be involved in the shooting. Taylor's fingerprints were also found on a cup in the vehicle Kercheval was driving.

Shortly before being apprehended by police, Taylor discarded a brown shirt. Bryson, the eyewitness to the shooting, identified the shirt discarded by Taylor as the shirt worn by the shooter. Material found on Taylor's hands was identified as possibly coming from a firearm.

Because evidence of the general location of the gun was received without objection and the subsequent hearsay was cumulative and because there was a substantial amount of other evidence that established Taylor's guilt, the guilty verdict against Taylor was surely unattributable to the error in admitting Copeland's hearsay testimony that the gun was found at 40th and Mary Streets. Admitting the evidence of the gun's exact location was harmless error.

## 2. Strominger's Identification

Over Taylor's objection, the district court allowed Strominger to identify Taylor as the person he had seen next to the vehicle suspected to be involved in the shooting. Taylor claims the court erred in permitting this identification, because it was tainted by the circumstances surrounding Strominger's previous identification of Taylor. He contends that Strominger's identification on the day of the shooting was overly suggestive, because Taylor was taken to Strominger in handcuffs and because Strominger was told that Taylor had been arrested nearby and had discarded a brown shirt before his arrest. He claims Strominger's identification also was undermined by Kercheval's testimony that Taylor left the white vehicle before the shooting and that Kercheval did not see Taylor again until long after the shooting.

[6] Strominger's identification of Taylor was the result of a showup. A showup is usually defined as a one-on-one confrontation where the witness views only the suspect, and it is commonly conducted at the scene of the crime, shortly after the arrest or detention of a suspect and while the incident is

still fresh in the witness' mind. *State v. Garcia*, 235 Neb. 53, 453 N.W.2d 469 (1990).

[7] An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law. *State v. Smith*, 269 Neb. 773, 696 N.W.2d 871 (2005). See, also, *Perry v. New Hampshire*, ___ U.S. ___, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012). The admission of evidence of a showup does not, by itself, violate due process. See *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). A determination of impermissible suggestiveness is based on the totality of the circumstances. See *id*.

The U.S. Supreme Court has stated a two-part test for determining the admissibility of an out-of-court identification: "First, the trial court must decide whether the police used an unnecessarily suggestive identification procedure. . . . If they did, the court must next consider whether the improper identification procedure so tainted the resulting identification as to render it unreliable and therefore inadmissible." *Perry*, 132 S. Ct. at 722.

[8] Reliability is the linchpin in determining the admissibility of identification testimony. *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005). We have stated:

> The factors to be considered [in determining the reliability of a witness' identification] include (1) the opportunity of the witness to view the alleged criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his or her prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. . . . Against these factors is to be weighed the corrupting influence of the suggestive identification itself.

*Id*. at 757, 696 N.W.2d at 427 (citations omitted).

We previously considered the constitutionality of a one-on-one identification in *State v. Wickline*, 232 Neb. 329, 440 N.W.2d 249 (1989), *disapproved on other grounds, State v. Sanders*, 235 Neb. 183, 455 N.W.2d 108 (1990). In *Wickline*, 232 Neb. at 335, 440 N.W.2d at 253, we concluded that the

identification of a defendant was not unduly suggestive where (1) the witness observed the defendant standing near a stolen vehicle and, a few minutes later, hiding behind a utility pole and (2) about 4 hours after initially observing the defendant, the same witness identified the defendant "without displaying or suggesting any uncertainty in her identification."

Strominger's identification of Taylor was made under circumstances comparable to those in *Wickline*, and we conclude that the identification of Taylor was not unduly suggestive or conducive to a mistaken identification. On the day of the shooting, Strominger observed a person outside a vehicle that may have been involved in the shooting. Within a matter of minutes, other police officers brought Taylor to Strominger's location. Strominger immediately identified Taylor as the person he had previously observed. Under these circumstances, Taylor was not denied due process of law. Strominger's identification was not unnecessarily suggestive or conducive to an irreparably mistaken identification.

Taylor emphasizes that he was handcuffed in the back of a police cruiser and that the officers who detained Taylor told Strominger that Taylor might be the person who ran from the white vehicle. But these facts do not render Strominger's identification unduly suggestive. Strominger was a police officer. His duties required him to identify suspects. As he was responding to a shooting, Strominger saw Taylor standing next to a vehicle that may have been involved in the shooting. Because Strominger thought Taylor also might have been involved in the shooting, Strominger provided a description of Taylor to other officers, who located Taylor based on that description. Then, during the initial minutes of the investigation, Strominger identified Taylor as the person he had observed near the suspect vehicle. This procedure was not unduly suggestive.

### 3. Sentence

Taylor was born in December 1991, and therefore, when the shooting occurred on September 19, 2009, he was under the age of 18 years. Because of his age, Taylor asserts that his sentence of life imprisonment was unconstitutional.

In *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), the U.S. Supreme Court concluded that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalties on juveniles. Accordingly, the Court held that mandatory sentences of life without parole for juveniles violated the Eighth Amendment's ban on cruel and unusual punishment.

*Miller* applies to cases that were on direct review when it was decided. See, *State v. Ramirez, ante* p. 356, ___ N.W.2d ___ (2014); *State v. Castaneda, ante* p. 289, ___ N.W.2d ___ (2014); *Whiteside v. State*, 2013 Ark. 176, ___ S.W.3d ___ (Apr. 25, 2013), *cert. denied* ___ U.S. ___, 134 S. Ct. 311, 187 L. Ed. 2d 220); *People v. Eliason*, 300 Mich. App. 293, 833 N.W.2d 357 (2013); *Hill v. Snyder*, No. 10-14568, 2013 WL 364198 (E.D. Mich. Jan. 30, 2013) (unpublished opinion). Taylor was sentenced in May 2012, and he appealed. *Miller* was decided that June. Because *Miller* was decided while Taylor's appeal was pending, its rule applies to him. See *Castaneda, supra*.

At the time Taylor was sentenced, Nebraska's statutes provided that a juvenile convicted of first degree murder was subject to mandatory life imprisonment. See Neb. Rev. Stat. §§ 28-105 (Cum. Supp. 2012) and 28-105.01 (Reissue 2008). The statutes did not expressly contain the qualifier "without parole." Nevertheless, because it provided no "meaningful opportunity" to obtain release, Nebraska's sentence of life imprisonment was effectively life imprisonment "without parole" under the rationale of *Miller* and *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). See *Castaneda, ante* at 314, ___ N.W.2d at ___.

We conclude that under *Miller*, Taylor's sentence of life imprisonment was unconstitutional. Because Taylor's life sentence was unconstitutional, it must be vacated and Taylor must be resentenced.

Taylor's resentencing is controlled by our recent decision in *Castaneda, supra*. In that case, we concluded that Neb. Rev. Stat. § 28-105.02 (Supp. 2013) applied to the resentencing of a defendant who was sentenced to life imprisonment without the possibility of parole for crimes he committed when he was

under the age of 18 years. Section § 28-105.02(1) provides that "the penalty for any person convicted of a Class IA felony for an offense committed when such person was under the age of eighteen years shall be a maximum sentence of not greater than life imprisonment and a minimum sentence of not less than forty years' imprisonment." When sentencing an individual under this statute, certain mitigating factors must be considered. See § 28-105.02(2). Section 28-105.02 was enacted after Castaneda and Taylor were sentenced for Class IA felonies but while their individual appeals were pending. See 2013 Neb. Laws, L.B. 44, § 2.

[9] The defendant in *Castaneda* argued, as does Taylor, that § 28-105.02 did not apply to him and that he should be sentenced for second degree murder. We rejected the argument of the defendant in *Castaneda* that § 28-105.02 increased the punishment available for his crime and concluded instead that the newly enacted statute did not violate ex post facto principles. We also determined that § 28-105.02 did not affect the elements of the offense or the facts necessary to establish guilt. "'[W]here a criminal statute is amended by mitigating the punishment, after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature has specifically provided otherwise.'" *State v. Castaneda, ante* p. 289, 319, ___ N.W.2d ___, ___ (2014) (quoting *State v. Randolph*, 186 Neb. 297, 183 N.W.2d 225 (1971)). We vacated Castaneda's life sentences and remanded the cause for resentencing under the procedures set forth in § 28-105.02.

Taylor's arguments are identical to those which we rejected in *Castaneda*. Therefore, for the reasons explained in *Castaneda*, we conclude that § 28-105.02 applies to Taylor upon resentencing. We vacate Taylor's life sentence and remand the cause for resentencing under the procedures set forth in § 28-105.02.

## VI. CONCLUSION

Taylor's assignments of error regarding alleged trial error are without merit, and we affirm his convictions. However, Taylor's sentence of life imprisonment was unconstitutional

and is therefore vacated. We remand the cause for resentencing by the district court as to Taylor's conviction for a Class IA felony. Taylor's sentence for use of a deadly weapon to commit a felony is affirmed and is to be consecutive to the sentence imposed by the district court on the murder conviction.

Affirmed in part, sentence vacated in part, and cause remanded for resentencing.

Connolly and McCormack, JJ., participating on briefs.

———————

Jeanette Carney, appellee, v.
Jacquelyn Miller, appellant.
___ N.W.2d ___

Filed February 14, 2014.    No. S-12-1138.

1. **Jurisdiction: Appeal and Error.** An appellate court determines jurisdictional questions that do not involve a factual dispute as a matter of law.
2. **Summary Judgment: Immunity: Appeal and Error.** The district court's denial of summary judgment on grounds of qualified immunity is subject to de novo review.
3. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties.
4. **Final Orders: Appeal and Error.** Generally, only final orders are appealable.
5. ____: ____. Under Neb. Rev. Stat. § 25-1902 (Reissue 2008), the three types of final orders that an appellate court may review are (1) an order that affects a substantial right and that determines the action and prevents a judgment, (2) an order that affects a substantial right made during a special proceeding, and (3) an order that affects a substantial right made on summary application in an action after a judgment is rendered.
6. **Summary Judgment: Final Orders.** An order denying summary judgment is not a final order under Neb. Rev. Stat. § 25-1902 (Reissue 2008).
7. **Final Orders.** The collateral order doctrine is an exception to the final order rule.
8. **Final Orders: Immunity: Appeal and Error.** Under the collateral order doctrine, the denial of a claim of qualified immunity is appealable, notwithstanding the absence of a final judgment, if the denial of immunity turns on a question of law.
9. ____: ____: ____. The denial of a claim of qualified immunity is immediately reviewable under the collateral order doctrine where the issues presented are purely questions of law.